**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Renee Roger DRAKE,**
**Defendant–Appellant.**

**No. 90–3125.**

United States Court of Appeals,
Tenth Circuit.

May 2, 1991.

Mark S. Bove, Denver, Colo., for defendant-appellant.

Christina L. Morris, Asst. U.S. Atty. (Lee Thompson, U.S. Atty., with her on the brief), Kansas City, Kan., for plaintiff-appellee.

Before BALDOCK and BRORBY, Circuit Judges, and ANDERSON, District Judge [*].

ALDON J. ANDERSON, District Judge.

In a joint trial, defendant-appellant Renee Roger Drake and one co-defendant, Calvin Dennis Reese, were tried before a jury on six counts of wire fraud under 18 U.S.C. § 1343. Drake was accused of obtaining financing from a factor by fraudulent means. On February 5, 1990, the jury returned a verdict of guilty on all counts as to Drake. The trial court declared a mistrial as to co-defendant Reese because the jury was unable to reach a verdict on the charges against him. Drake appeals his convictions on two points: 1) the verdict of the jury was not supported by the evidence presented; and 2) the trial court improperly permitted prejudicial cross-examination of Drake regarding his educational background.

I.

Drake served as Vice President in charge of day-to-day operations of Agricultural Technology International Marketing, Inc. ("ATIM"). R.Vol. IV at 461. In 1984, the Bank of Louisburg gave ATIM a working capital loan and a loan secured by a real estate mortgage. R.Vol. II at 56–57. Co-defendant Reese, the President of the Bank of Louisburg, served as ATIM's loan officer. *Id.* at 26, 55. Subsequent to providing ATIM the loans, the Bank of Louisburg secured additional collateral in the form of a security interest in accounts receivable, after-acquired accounts receivable, and other items. *Id.* at 73–75.

[*] Honorable Aldon J. Anderson, Senior United States District Judge for the District of Utah, sitting by designation.

In need of additional financing, Drake obtained further credit for ATIM from the William R. Payne Company. R.Vol. II at 113. The Payne Company lent ATIM money based on individual accounts receivable. *Id.* at 119. After being assured by co-defendant Reese that the Bank of Louisburg did not have a security interest in ATIM's accounts receivable, the Payne Company took a security interest in ATIM's accounts receivable then owned or thereafter acquired. *Id.* at 116–117, 118–119. The Payne Company made a corresponding UCC–1 filing which Drake signed. *Id.* at 122–125. The Payne Company limited the ATIM line of credit when it failed to receive several payments due on the account. *Id.* at 130.

Having been limited by the Payne Company, ATIM sought the financing that is the focus of the convictions now on appeal. In the fall of 1984, Drake spoke with John Cummings, Assistant Manager of United California Factors ("UCF"), regarding the option of "factoring." R.Vol. III at 253–54. Factoring is the direct sale of accounts receivable at a discount. UCF sent one of their application forms for factoring to Drake at ATIM. *Id.* at 257. On the form, Drake stated that the Bank of Louisburg was the only party holding a security interest in ATIM accounts receivable. *Id.* at 271. On the form, Drake failed to identify the Payne Company even as a creditor of ATIM. *Id.* After reviewing and checking the information provided by Drake, UCF decided to factor some ATIM accounts. *Id.* at 247, 282–83.

UCF provided ATIM a total of $56,186.53 in six payments made by wire transfer. R.Vol. III at 294. During the course of these payments, UCF discovered the Payne Company's UCC–1 filing covering ATIM's accounts receivable. *Id.* at 295. When questioned about this filing, Drake assured UCF that the Payne Company did not hold a security interest in ATIM's accounts. *Id.* at 298–99.

Drake was charged with six counts of wire fraud, representing the six payments by UCF. A jury convicted Drake on all six counts. Drake now appeals.

## II.

### Sufficiency of the Evidence.

■ At the close of the government's case and at the close of all the evidence, Drake moved for judgment of acquittal on the grounds that the evidence presented was not sufficient to support a conviction. The trial court denied both motions. We consider evidence sufficient to support a criminal conviction if, viewing all the evidence, both direct and circumstantial, in the light most favorable to the government, a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. *United States v. Culpepper,* 834 F.2d 879, 881 (10th Cir.1987), *citing Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979).

■ The crime of wire fraud consists of two essential elements. The prosecution must prove: 1) a scheme or artifice to defraud or obtain money by false pretenses, representations, or promises; and 2) use of interstate wire communications to facilitate that scheme. *United States v. Brien,* 617 F.2d 299, 307 (1st Cir.1980), *cert. denied* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980). Drake asserts that the evidence failed to demonstrate the first element, a scheme to defraud.

Drake bases his argument on the definition of "scheme to defraud by false representations" under 18 U.S.C. § 1343. The cases define a scheme to defraud as "one reasonably calculated to deceive persons of ordinary prudence and comprehension."[1] *See, e.g., United States v. White,* 673 F.2d 299, 302 (10th Cir.1982); *United States v. Washita Constr. Co.,* 789 F.2d 809, 817 (10th Cir.1986). Drake argues that his misrepresentations could not have deceived a

---

1. The trial court charged the jury with an instruction, the propriety of which is not disputed, which stated in pertinent part: "You are instructed that a 'scheme to defraud by false representations' is one reasonably calculated to deceive persons of ordinary prudence and comprehension. Implicit in this definition is the requirement that the misrepresentations be material. Further, deceitful concealment of material facts may also constitute fraud."

financier of ordinary prudence because of the Payne Company's UCC–1 filing. Drake asserts that a reasonable financier would not have agreed to provide any money before checking for, and then on, the UCC–1 financing statement. For this reason, contends Drake, a reasonable financier would not be deceived into thinking no security interest existed by Drake's misrepresentation. Drake urges that, therefore, no scheme to defraud existed because his actions were not calculated to deceive "persons of ordinary prudence." Drake, however, misreads this portion of the definition of a scheme to defraud. Interestingly, ample evidence exists to support a finding that a reasonable factor could have been deceived by Drake's misrepresentations. Because we find Drake's basic legal position untenable, however, we need not examine that evidence.

■ The focus of the language defining a scheme to defraud is on the violator, not the victim. The definition provides the fact-finder with a standard for determining from the accused's actions whether the accused possessed the requisite mens rea from his actions. *See Gusow v. United States,* 347 F.2d 755, 756 (10th Cir.1965). In our review of the cases employing this definition, we find that courts use the definition to determine whether an accused's actions were "calculated to deceive." *See, e.g., id.* (using definition and noting "[d]irect proof of willful intent is not necessary"); *White,* 673 F.2d at 302 (focusing on mental state of accused). We do not find any cases using the definition to determine whether the accused targeted the proper victim. We find no precedent supporting Drake's position that a scheme to defraud is a violation only if it would deceive a reasonably prudent person. *But cf. Lindsey v. United States,* 332 F.2d 688, 690 (9th Cir.1964) (sufficient that defendant sought to induce action by misrepresentation and actual reliance by intended victim is immaterial). To accept Drake's argument would require us to hold that a party who fully intends to deceive a victim may avoid criminal liability by designing a scheme sufficiently unusual that the law would deem it unbelievable by a reasonably prudent person. We do not find this position persuasive.

■ As for Drake's general assertion that the evidence does not support a finding of a scheme to defraud, we disagree. Viewed in the light most favorable to the government, the evidence shows that Drake stated on the application form, "[a]ll debt through bank of Louisburg" when Drake knew ATIM had obtained financing from the Payne Company on ATIM accounts receivable. When UCF discovered that the Payne Company had made a UCC–1 filing covering ATIM's accounts receivable, Drake assured UCF that Payne Company had no actual security interest in ATIM assets. Drake told UCF that there would be no difficulty in getting the Payne Company to withdraw its UCC–1 filing. The evidence presented at trial was sufficient to sustain a jury finding that a scheme to defraud by false representations existed within the meaning of 18 U.S.C. § 1343.

### III.

#### Cross–Examination of Appellant Drake.

At trial, a portion of Drake's defense centered on his claim that he was unaware of the Payne Company's security interest in after-acquired accounts receivable. Drake asserted that he believed ATIM had granted a security interest only in then existing accounts receivable. In support of this position, Drake testified that he had no formal training in business management. Drake noted that his background was as a business consultant with an emphasis on psychological applications and considerations in business management. Possibly in support of this argument, Mr. Drake was asked during direct examination, "Mr. Drake, basically, what is your background and education?" Drake answered, "Majored in psychology and the usual things that go along with a major." R.Vol. IV at 458. On cross-examination, Drake testified that he had a degree in psychology.

The assistant U.S. Attorney impeached Drake on this point through the use of prior inconsistent statements. *Id.* at 537–

39. Drake explained the inconsistencies by testifying, "No, I do not have a diploma that says I have 120 graduate hours. I have a completed major, and I did practice clinical psychology. It was at the University of Illinois and Roosevelt University.... I would have completed it probably around [19]53 to '54." *Id.* at 540.

The Assistant U.S. Attorney proceeded to cross-examine Drake on several other matters. Several hours later, after the noon break, the Assistant U.S. Attorney reopened her cross-examination of Drake with the following exchange:

Q. (By Ms. Robinson) I'm sorry. Mr. Drake, if we would clarify the record, is your testimony that you do or you do not have a degree in psychology?

A. I do not—

MR. SHARBUTT: I am going to object. I think we spent probably twenty minute [sic] on that this morning. I think he's answered that he does not have an official degree but he had the hours that were necessary in his major.

THE COURT: Overruled. Go ahead.

A. I do not have the official diploma document, no. I am not shown as a graduate per se of the institution of Roosevelt University in Chicago. I did complete my major which qualified me to practice.

Q. (By Ms. Robinson) All right. So when you testified under oath at the deposition and the trial that you had a B.A. degree, that was not a true statement?

A. I was in a hurry and that was wrong. I felt that way because I completed my major, and I was qualified for psychiatry—psychology. In reflection, yes, it was wrong.

Q. All right. Now, you also testified that you had done some work at the University of Illinois and then later you went to Roosevelt University, that is where you finished?

A. Yes.

Q. When you transferred from the University of Illinois to Roosevelt, did you transfer your credits from the University of Illinois?

A. Of course.

Q. All right. If the University of Illinois' records reflect that no credits were ever transferred, do you have any explanation for that?

A. I would have no explanation for that.

Q. Isn't it a fact that you didn't really have very many grades to transfer because most of your grades were flunking grades?

A. Not that I recall.

Q. And you left there in 1951 so it wouldn't be possible for you to stack up enough hours by 1954 or '55 to be close to a degree at Roosevelt University?

A. Not true.

Q. If the records reflect that you had Fs and Ds and a few Cs and only one B during your three semesters there, those records would be inaccurate?

A. At the University of Illinois?

Q. Yes.

A. I don't recall my records there. I just know they were transferred.

Q. Also, isn't it a fact that you were actually kicked out of the University of Illinois in 1951?

A. No.

Q. So if the records reflect that you were kicked out for falsifying facts in a disciplinary investigation, is your testimony that that would not be right?

MR. SHARBUTT: Your Honor, I'm going to object to this line of questions. This constant reference to records reflect, I think if there are some records, we should have them in evidence. They should be subject to proper ID, subject to foundation requirements rather than this line of questioning. I think if there are records that are going to be in evidence, let's get them in.

MS. ROBINSON: Your Honor, I have the custodian of the records upstairs in my office. I do have the record here. I imagine Mr. Drake has never seen this record or doesn't have it, but if Mr. Sharbutt wants to have it offered into evidence, I would have no objection.

MR. SHARBUTT: Your Honor, at this time Defendant Drake moves for mistrial on the grounds of this line of questioning. This line of questioning is only done, has no probative value with any of the facts that are to be presented to the jury, and it's merely to inflame the jury and on those grounds we move for mistrial.

THE COURT: Overruled. He may answer it. If you have your custodian here, why, we can get right into it.

Q. (By Ms. Robinson) All right. Mr. Drake, then, if the transcript and record from the University of Illinois indicates that you were dismissed from the university at the close of the second semester 1950 to 1951 for violation of terms of your probation and for falsification of facts in a disciplinary investigation, is it your testimony this document is not correct?

A. I would dispute that, yes.

R.Vol. IV at 547–50. The Assistant U.S. Attorney then moved to other subject areas.

■ Drake argues this line of questioning was improper on two grounds. First, the questions dealt with unfairly prejudicial and irrelevant material. Second, the questions themselves constituted the introduction of extrinsic evidence of specific instances of conduct offered in violation of Fed.R.Evid. 608(b).[2] In general, the trial court has broad discretion in ruling on evidentiary matters. *United States v. Alexander*, 849 F.2d 1293, 1301 (10th Cir.1988). We may not reverse the trial court's evidentiary rulings "in the absence of an abuse of discretion." *Id.* (citations omitted.)

■ We begin by examining whether the subject matter of the cross-examination was appropriate. As a preliminary matter during direct testimony, Drake testified that his educational background consisted of "a major in psychology." This testimony opened the area of Drake's educational background to cross-examination and provided a potential target for impeachment. Fed.R.Evid. 611(b).[3] *See Alford v. United States*, 282 U.S. 687, 691–93, 51 S.Ct. 218, 219–20, 75 L.Ed. 624 (1931) (cross-examination on preliminary testimony as to witness' place of residence is proper).

■ In response to the prosecutor's exploration of Drake's educational background, Drake made certain factual assertions that created potential targets for impeachment. Drake initially stated that he had a degree in psychology. After being impeached through the use of prior inconsistent statements, Drake asserted that he had finished the requirements for a degree though he had not actually received one. The prosecutor later sought to impeach Drake on this and related points. The prosecutor did so by attempting to elicit admissions from Drake that his testimony

---

2. Rule 608(b) provides:

**EVIDENCE OF CHARACTER AND CONDUCT OF WITNESS**

    .     .     .     .     .

    **(b) Specific instances of conduct.** Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

    .     .     .     .     .

Fed.R.Evid. 608(b).

3. Rule 611 provides:

**MODE AND ORDER OF INTERROGATION AND PRESENTATION**

    **(a) Control by court.** The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

    **(b) Scope of cross-examination.** Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

    .     .     .     .     .

Fed.R.Evid. 611.

was incorrect. Such a tactic is permissible to probe a witness' credibility through contradiction. *See United States v. Greschner*, 802 F.2d 373, 383 (10th Cir.1986) (prosecution may try to impeach by eliciting an admission that a witness testified falsely); *see generally United States v. Park*, 525 F.2d 1279, 1283 (5th Cir.1976) (restrictive rule does not foreclose questions intended to impeach a witness). The subject of the prosecutor's cross-examination was not, therefore, inappropriate.

Having determined that permitting the prosecutor to inquire into this subject matter on cross-examination was not inappropriate, the court must now determine whether the form of cross-examination permitted by the trial court was an abuse of discretion. Fed.R.Evid. 611(b). Drake urges that the questions constituted the introduction of extrinsic evidence of specific instances of conduct in violation of Rule 608(b).

■ The questions posed by the prosecutor referred to the contents of school records not in evidence and specific instances of conduct approximately thirty years old. Cross-examination questions alone, however, cannot constitute extrinsic evidence. *See generally United States v. Crosby*, 713 F.2d 1066, 1074–75 (5th Cir. 1983) (prosecutor's factual assertion on cross-examination was not improper); *United States v. Cole*, 617 F.2d 151, 154 (5th Cir.1980) (cross examination question explicitly referring to contents of a document not in evidence did not qualify as extrinsic evidence). The court, therefore, rejects Drake's argument.[4]

■ Though the questions asked did not constitute extrinsic evidence, they were arguably improper because they assumed facts not in evidence.[5] *See Scogen v. Dow Chemical Co.*, 375 F.2d 692, 704 (8th Cir. 1967). The questions implied that the records actually did support the facts asserted by the prosecutor. The contents of the records were not in evidence. The court, however, cannot find that any substantial right of Drake has been affected. *See generally* Fed.R.Evid. 103 (no error unless substantial right of a party affected). Drake had already been effectively impeached on a closely related issue by the use of inconsistent statements. Furthermore, by the time Drake's counsel made the objection now being appealed, he had already permitted a number of almost identical questions to be posed.[6] *See Reagan v. Brock*, 628 F.2d 721, 723–24 (1st Cir.1980) (objection made after line of similar questions and after specific question had already been answered is not a timely objection). The damage had already been done by the time counsel raised the objection now on appeal. The court finds, therefore, that the trial court did not abuse its discretion nor thereby commit a harmful error.

## CONCLUSION

The arguments asserted by defendant-appellant Drake are without merit. The government presented sufficient evidence to the jury to support a finding that a scheme reasonably calculated to deceive existed within the meaning of 18 U.S.C. § 1343. Furthermore, the trial court did not abuse its discretion in permitting the prosecutor to cross-examine and impeach Drake regarding his educational background.

AFFIRMED.

---

4. Because we find that the prosecutor's questions were not extrinsic evidence, we expressly do not rule on whether Rule 608 encompasses the prosecutor's questions. Rule 608 deals primarily with methods of proving character. *See* Fed.R.Evid. 608. We need not determine whether questions asked to elicit contradictory answers are limited by Rule 608 as a method of proving character.

5. The argument that the questions improperly assumed facts not in evidence better reflects the objection raised by Drake at trial than the extrinsic evidence argument now asserted on appeal. At trial, Drake did not contend that extrinsic evidence was inadmissible on these issues. In fact, Drake invited the introduction of extrinsic evidence. Drake merely objected to the reference to records not before the jury. *See supra* at p. 866.

6. Drake's counsel initially objected to this line of questioning as being cumulative. Drake does not now argue such grounds on this appeal.