33 F.3d 63
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Adam James JEFFERY, Defendant-Appellant.
 No. 93-6295.
 United States Court of Appeals, Tenth Circuit.
 Aug. 25, 1994.
 
 Before KELLY, Circuit Judge and McKAY, Senior Circuit Judge, and BRIMMER, District Judge.*
 ORDER AND JUDGMENT**
 BRIMMER, District Judge.
 Appellant Adam James Jeffery was convicted of three counts of mail fraud and five counts of wire fraud, in violation of 8 U.S.C. Secs. 1341 and 1343, and one count of money laundering, in violation of 18 U.S.C. Sec. 1956(a)(1)(A)(i). On appeal, he challenges the sufficiency of the evidence to support his conviction, and makes claims under the Sentencing Guidelines regarding the sentence enhancement which the district court imposed for obstruction of justice. He also challenges the district court's imposition of restitution for certain losses. We exercise jurisdiction pursuant to 28 U.S.C. Sec. 1291 and 18 U.S.C. Sec. 3742(a)(2).
 I.
 In October of 1992, Mr. Jeffery was indicted on eight counts of mail and wire fraud and one count of money laundering. Jeffery was accused of engaging in a scheme to obtain money from prospective adoption couples whereby he misrepresented the availability of unborn children. Jeffery readily admitted to the acts which made up the substance of the charges against him. That is, the use of the mail to send or receive documents, the use of the telephone to discuss aspects of adoption with clients, the receipt or transmission of facsimile transmissions and the receipt of funds by wire transfer. The issue at trial was whether Mr. Jeffery acted with intent to defraud.
 The evidence introduced at trial revealed the following facts. Until November of 1991, Mr. Jeffery was employed as an attorney in a small law firm. Thereafter, he leased office space from other lawyers and worked as a sole practitioner. During this time, he came into contact with at least fourteen couples seeking to adopt a child. These couples paid a fee to Mr. Jeffery in return for his assistance in their adoptions. However, none of the couples received a baby nor did they receive a refund of the fees they paid to Jeffery.
 As part of his scheme, Jeffery told clients seeking to adopt that he represented a pregnant woman who wanted to give her child up for adoption. He provided adoptive parents with a biographical sketch of the birth mother; often the same sketch as was provided to other adoptive parents. Sometimes Jeffery provided a photograph of the birth mother which accompanied the written biography. Jeffery obtained payment from various clients of between $8,000.00 and $15,000.00, usually by cashier check which was to be held in trust and used to pay the medical expenses of the birth mother and legal expenses of the adoption after the baby was born. After the supposed date of the babies' birth, Jeffery would represent to the adoptive parents that the adoption fell through for one reason or another. With the exception of one couple, the adoptive parents never received a refund of their money.
 Federal Bureau of Investigation Special Agent David Swanson's investigation revealed that the adoption fees paid by the victims specified in the indictment were withdrawn from the "trust" account shortly after their deposit. In one case, Jeffery used the adoption trust to purchase an automobile.
 The testimony of several victims and of Special Agent Swanson showed that Jeffery had provided copies of the same biography of purported birth mothers to multiple clients. The photographs which Jeffery represented as pictures of the woman carrying the child they had paid to adopt were also given to multiple clients and, in at least one instance, the subject of the photograph was a high school classmate of Mr. Jeffery.
 After trial, the jury returned a verdict of guilty on each of the nine counts in the indictment. The district court sentenced Jeffery to the Bureau of Prisons for a total of 87 months: sixty months on the mail and wire fraud counts, and 87 months on the money laundering count, to run concurrently. This sentence included an enhancement for the obstruction of justice pursuant to U.S.S.G. Sec. 3C1.1. In addition, Jeffery was ordered to serve a three year term of supervised release. The district court also ordered Jeffery to pay a total of $32,000.00 restitution and $450.00 in special assessments.
 Jeffery raises three issues on appeal: (1) whether the evidence at trial was insufficient to support his conviction; (2) whether the district court erred in applying the two level sentence enhancement for obstruction of justice pursuant to U.S.S.G. Sec. 3C1.1; and (3) whether the district court erred by imposing restitution for losses resulting from acts other than those for which Jeffery was convicted.
 II.
 The sufficiency of evidence is a question of law subject to de novo review. See, e.g., United States v. Reicher, 983 F.2d 168, 170 (10th Cir.1992), cert. denied, --- U.S. ----, 62 U.S.L.W. 3722, 1994 WL 158374; United States v. Grimes, 967 F.2d 1468, 1472 (10th Cir.), cert. denied sub nom, McGlynn v. United States, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992). The reviewing court must examine the evidence in the light most favorable to the government to determine if there is sufficient proof from which a reasonable jury could find guilt beyond a reasonable doubt. United States v. Hooks, 780 F.2d 1526, 1531 (10th Cir.), cert. denied, 475 U.S. 1128 (1986). The evidence will be considered sufficient if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also United States v. Hollis, 971 F.2d 1441, 1447 (10th Cir.1992), cert. denied, 113 S.Ct. 1580, 123 L.Ed.2d 148 (1993).
 A.
 In order to prove allegations of mail fraud or wire fraud, the prosecution must establish: (1) a scheme or artifice to defraud or to obtain money by false pretenses, representations or promises; and, in the case of mail fraud, (2) the use of the mails to execute or further the scheme. United States v. Zang, 703 F.2d 1186, 1193 (10th Cir.1982), cert. denied, 464 U.S. 828 (1983). In the case of wire fraud, the government must prove the use of interstate wire communications to further the scheme. United States v. Drake, 932 F.2d 861, 863 (10th Cir.1991). A scheme to defraud has been defined as "one reasonably calculated to deceive persons of ordinary prudence and comprehension." Id. at 863.
 The appellant asserts that the government has failed to introduce sufficient evidence to prove that he devised or intended to devise a scheme to defraud. In Drake, this Court noted that the definition of a scheme to defraud "provides the fact-finder with a standard for determining from the accused's actions whether the accused possessed the requisite mens rea...." Id. at 864. Direct proof of willful intent is not necessary to establish the scheme to defraud element. Rather, the mens rea may be inferred from the conduct of the accused. See Gusow v. United States, 347 F.2d 755, 756 (10th Cir.), cert. denied, 382 U.S. 906 (1965). Indeed, the making of a statement which is patently false or which is made with reckless indifference to its truth is evidence of intent to defraud. United States v. MacKay, 491 F.2d 616 (10th Cir.1973), cert. denied, 416 U.S. 972 (1974).
 Mr. Jeffery submits that the scheme to defraud in this case was "no more than poor timing, poor planning, poor workmanship and poor judgment." However, even a cursory review of the evidence introduced in this case shows that there was sufficient evidence for a reasonably jury to conclude that Jeffery acted with the requisite intent to deceive.
 The evidence established that Mr. Jeffery convinced a number of couples to pay him a fee in exchange for his services enabling them to adopt babies; that Mr. Jeffery made numerous misrepresentations regarding the existence of birth mothers, their biographical backgrounds, the status of their pregnancies, and the reasons for the failed adoption; that Mr. Jeffery failed to refund deposits paid by prospective adoptive parents; and that Jeffery used the trust money for his own purposes. Although the evidence of his intent was circumstantial, when viewed in a light most favorable to the government, logical inferences can be drawn which support Jeffery's mail and wire fraud convictions.
 Count one of the Indictment charges Jeffery with mail fraud regarding Mr. and Mrs. Childers who were seeking to adopt a baby. Jane Childers' testimony revealed that she and her husband met with Jeffery and paid him $10,000.00 to arrange the adoption of a particular child to be born to a pregnant seventeen year old. Jeffery told the Childers' that the money would remain in trust until the child was born and then would be used for medical and legal expenses. Jeffery provided them with a biography of the birth mother and frequent updates about the progress of her pregnancy. When the time came for the birth of the child, Jeffery told the Childers that the birth mother had changed her mind. Mrs. Childers testified that Jeffery offered them another child, allowing the couple to choose between photos of two birth mothers. Jeffery assured them that the $10,000.00 would remain in trust pending the birth of the second child. Again, he provided them with a detailed biography of the birth mother, the same document that was provided to two other couples, and again, when the time came for the child's birth, he told them a complicated story of a problematic labor and that the mother had changed her mind.
 Special Agent Swanson testified that he had traced the $10,000.00 paid by the Childers and found that the sum was depleted within a week of its deposit into the Jeffery's client trust account and that he had used as much as $7,000.00 of it to purchase a used Porsche. All but $100.00 of the remainder he took out in cash.
 Other victims told similar tales. Count two of the Indictment charges Jeffery with mail fraud regarding the Damrons. Pamela Damron testified that in January of 1992, Jeffery told her that he represented a pregnant sixteen year old who wanted to give her baby up for adoption. He requested a fee of $15,000.00 which would be held in trust until the Damrons had the baby. Mrs. Damron paid $5,000.00 by cashier's check in January and the remaining $10,000.00 by cashier's check in February. Again, Jeffery provided the adoptive couple with a biography of the birth mother. The evidence at trial showed that the same biography was given to three other couples. And, again, he provided oral updates on the mother's condition and the progress of her pregnancy. Again, when the time came for the baby's birth, Jeffery told Mrs. Damron that the mother had changed her mind. Agent Swanson found that Jeffery withdrew the $5,000.00 fee two days after he had deposited it into his client trust account and that Jeffery removed the $10,000.00 payment in cash in five increments between January 19, 1992 and March 4, 1992.
 Count three charges Jeffery with wire fraud in connection with his dealings with Mr. and Mrs. Robinson. Randall P. Robinson testified that he and his wife met with Jeffery in September of 1991 to discuss adopting a child. Jeffery showed them two photographs of birth mothers, the same photos shown to Mr. and Mrs. Childers, and allowed them to select whose baby they would like to adopt. Mr. Robinson paid Jeffery $14,000.00 to be held in trust until the baby was born and then it would be used to pay medical and legal expenses. Jeffery provided the Robinsons with a biography of the birth mother, the same biography he gave to the Childers and the Garlands. When the scheduled date for the child's birth had passed, Jeffery told Mr. Robinson stories about a difficult labor and the birth mother's decision to keep her baby. Jeffery had deposited the $14,000.00 in his trust account and had depleted the sum through cash withdrawals by September 28, 1991.
 Jeffery was charged with mail fraud of Mr. and Mrs. Starr in Count 4 of the Indictment. Vanda Starr testified that she and her husband had received a birth mother's biography from Jeffery through another couple. Jeffery also provided this biography to three other couples: the Williams, the Mannings, and the Damrons, representing that it described the birth mother of the child they had each paid him to adopt. Mr. and Mrs. Starr contacted him to discuss adopting the child. Mrs. Starr told Jeffery that she could only pay $8,000.00. He came to her office to pick up a $4,000.00 cashier's check as partial payment and told her that the money would be put in trust to cover the birth mother's medical expenses. Mrs. Starr later mailed Jeffery an additional $1,000.00. Jeffery cashed the $4,000.00 cashier's check on the same day he received it and depleted the additional $1,000.00 within a day of depositing it in his account.
 Evelyn Rutherford testified to a similar course of events. Counts five and six of the indictment charge Jeffery with mail and wire fraud in connection with her attempted adoption through him. In June of 1992, Jeffery told her that he had a baby to be born in August who was available for adoption. He sent her a copy of the birth mother's biography via facsimile transmission. Jeffery had previously provided the same biography to another couple, representing that it described the woman whose child they had paid to adopt. Jeffery also sent Mrs. Rutherford a photograph, purportedly of the birth mother, but which was the same photo shown to other adoptive couples. Mr. and Mrs. Rutherford agreed to pay a $15,000.00 adoption fee and wire transferred $12,900.00 of that amount to Jeffery's bank account. As soon as the money was credited to his account, Jeffery withdrew $10,000.00 by purchasing a cashier's check payable to Mr. and Mrs. Childers. Mrs. Childers testified that she had insisted upon the return of her $10,000.00 after the second adoption had fallen through.
 Count eight charges Jeffery with the wire fraud of Eva Archer-Smith. On June 24, 1992, Mrs. Archer-Smith spoke to Jeffery about adopting a child. Jeffery described the birth mother, a pregnant school girl, in detail and faxed her a written biography of the mother. This biography had also been provided to the Turners with Jeffery's representation that the woman's baby was due in February of 1992. Mrs. Archer-Smith agreed to pay Jeffery $15,000.00 as an adoption fee to be used for the birth mother's medical expenses and for legal fees. Jeffery led her to believe that it was urgent that she sent the money immediately. On June 30, 1992, Mrs. Archer-Smith complied and wire transferred a $7,500.00 payment to Jeffery's bank account. On the same day, Jeffery withdrew the entire sum, using it in the purchase of a $12,000.00 cashier's check payable to Charles and Gwen Hatfield. Mr. Hatfield testified that he had threatened Jeffery with the police if he did not return the $12,000.00 adoption fee the Hatfields had paid him by 3:30 p.m. on June 30, 1992.
 Finally, Count nine of the Indictment charges Jeffery with wire fraud of Nancy McLaughlin. Jeffery told Mrs. McLaughlin in July of 1992, that he had a baby available for adoption to be born September 6, 1992 and faxed her a biography of the birth mother. He told her that the adoption fee would be $15,000.00, two thirds of which should be sent as soon as possible to be used for prenatal care. Jeffery requested that she wire the money to his bank account. Mrs. McLaughlin, however, was suspicious of the deal. She did not send the money and notified the Oklahoma Bar Association instead.
 Upon review of this evidence, we conclude that a reasonable jury could find Jeffery guilty beyond a reasonable doubt of the mail and wire fraud counts in the Indictment.
 B.
 Count Seven of the Indictment charges Jeffery with money laundering. The statute which prohibits money laundering provides, in pertinent part, that:
 Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity ... with the intent to promote the carrying on of specified unlawful activity ... shall be sentenced to ... imprisonment for not more than twenty years....
 18 U.S.C. Sec. 1956(a)(1)(A)(i). In establishing a violation of this statute, the government must show the financial transaction was conducted with the intent to promote the mail or wire fraud scheme. United States v. Johnson, 971 F.2d 562 (10th Cir.1992).
 Jeffery again argues that the government has failed to prove the requisite intent. In particular, he asserts that there is insufficient evidence to prove he conducted a financial transaction with the intent to promote the carrying on of specified unlawful activity, that is, the mail and wire fraud scheme. He contends that, at most, the evidence showed that he conducted the financial transaction at issue to fulfill his agreement to refund an adoption fee to Jane and Dandy Childers.
 Again, we disagree. It is important to note that direct evidence of a defendant's intent is seldom available, but that intent may be established from the surrounding circumstances. Id. at 566. The financial transaction at issue here was Jeffery's purchase of a cashier's check. On January 19, 1991, Mr. and Mrs. Childers paid Jeffery $10,000.00 as a fee for the adoption of a particular baby. He took the money from his client trust account shortly thereafter and used part of it to purchase a Porsche. In June of 1992, having been through two failed attempts to adopt a child through Jeffery, Mrs. Childers demanded her money back. Over the course of several weeks, she became increasingly insistent that Jeffery return the money. At the same time Mrs. Childers was pressuring Jeffery for the return of her money, he persuaded Mrs. Rutherford, among others, to send him a $15,000.00 adoption fee. As soon as the Rutherford's wire transfer reached his account on June 29, 1992, Jeffery used the money to purchase a cashier's check payable to the Childers.
 Under these circumstances it is a reasonable inference to conclude that paying Mrs. Childers by cashier's check, as she insisted, was critical to the promotion of Jeffery's adoption scheme. See, e.g., Beasley v. United States, 327 F.2d 566 (10th Cir.) (letters designed to conceal a fraud by lulling a victim into action found to be a part of a mail fraud scheme), cert. denied, 377 U.S. 944 (1964). Thus, we conclude that the evidence is sufficient to show that Jeffery conducted the financial transaction, which involved the proceeds of wire fraud, with the intent to promote the carrying on of a mail and wire fraud scheme. Accordingly, the evidence is sufficient to sustain his conviction on the money laundering count.
 III.
 We now turn to the question of whether the district court erred in applying the two level sentence enhancement for obstruction of justice pursuant to U.S.S.G. Sec. 3C1.1. Section 3C1.1 instructs as follows:
 If the defendant willfully obstructed or impeded, or attempted to impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.
 
 
 1
 The type of conduct to which this enhancement applies includes "committing, suborning, or attempting to suborn perjury." U.S.S.G. Sec. 3C1.1, comment, n. 3(b).
 
 
 2
 At sentencing in this case, the trial court overruled Jeffery's objection and determined that the two point enhancement was appropriate due to Jeffery's lack of candor at trial. Jeffery asserts that the court's application of the enhancement was erroneous because the court failed to make the necessary findings establishing perjury.
 
 
 3
 In review of the district court's application of the guidelines, we will not disturb the lower court's findings of fact unless those findings are clearly erroneous. United States v. Litchfield, 959 F.2d 1514, 1523 (10th Cir.1992).
 
 
 4
 In United States v. Dunnigan, 113 S.Ct. 1111, 1117-18 (1993), the Supreme Court upheld the constitutionality of the section 3C1.1 sentence enhancement based upon the defendant's perjury. The Court defined perjury, stating, "[a] witness testifying under oath or affirmation [commits perjury] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." Id. at 1116 (citing 18 U.S.C. Sec. 1621). In Dunnigan, the Supreme Court recognized that a defendant's testimony may be truthful even if she is ultimately convicted by the jury. The Court held that because of this concern, "if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same...." Id. at 1117. The Court went on to specify what is required by the trial court:
 
 
 5
 [I]t is preferable for a district court to address each element of the alleged perjury in a separate and clear finding. The district court's determination that enhancement is required is sufficient, however, if ... the court makes a finding of an obstruction or impediment of justice that encompasses all of the factual predicates for a finding of perjury.
 
 
 6
 Id. This Court has recently adopted the Supreme Court's decision in Dunnigan. In United States v. Garcia, 994 F.2d 1499, 1509 (10th Cir.1993), we stated:
 
 
 7
 In order to impose an obstruction of justice enhancement based on a defendant's testimony at trial, "a district court must review the evidence and make independent findings" that the defendant gave "false testimony concerning a material matter with the willful intent to provide false testimony rather than as a result of confusion, mistake or faulty memory."
 
 
 8
 (citing Dunnigan, 113 S.Ct. at 1116-17).
 
 
 9
 In Dunnigan, the Court upheld the imposition of the section 3C1.1 enhancement based upon the district court's finding that
 
 
 10
 the defendant was untruthful at trial with respect to material matters in this case. [B]y virtue of her failure to give truthful testimony on material matters that were designed to substantially affect the outcome of the case, the court concludes that the false testimony at trial warrants an upward adjustment by two levels.
 
 
 11
 Id. (emphasis in original).
 
 
 12
 In this case, the district court concluded:
 
 
 13
 My evaluation of Mr. Jeffery's testimony at trial is that in the respects alleged by the government and in many respects, in fact, it was a story so farfetched that it would incline those listening to it to consider the justice system a mockery. It certainly made a mockery of the oath to testify truthfully and I believe that in the circumstances where the story constitutes much more than a simple denial of guilt but amounts to a story on its own going outside simply denial, that justifies the obstruction of justice enhancement and I will overrule the defendant's objection.
 
 
 14
 We hold that the trial court made an adequate independent assessment of the evidence that Jeffery committed perjury as required by Dunnigan and Garcia. Given the testimony of numerous victim witnesses and one purported birth mother at trial which contradicted Jeffery's testimony and his attempt to legitimize his actions, there is sufficient support for the district court's finding. As a result, the district court's application of the section 3C1.1 sentence enhancement will not be disturbed.
 
 IV.
 
 15
 The last issue that we must address is whether the district court erred in its imposition of restitution. We apply a de novo standard of review to questions of the legality of a sentence. United States v. Cook, 952 F.2d 1262, 1262 (10th Cir.1991); United States v. Teehee, 893 F.2d 217, 273 (10th Cir.1990). In performing our review, however, we must accept the findings of fact of the district court unless they are clearly erroneous and we must give due deference to the district court's application of the guidelines to the facts. Id. at 274 (citing 18 U.S.C. Sec. 3742(e)).
 
 
 16
 Under the Victim and Witness Protection Act of 1982 ("VWPA"), 18 U.S.C. Secs. 3579 and 3580, recodified under the Sentencing Reform Act of 1984 at 18 U.S.C. Secs. 3663 and 3664, a district court has the authority to order restitution for the offense to which a defendant has been convicted. In Hughey v. United States, 495 U.S. 411, 420 (1990), the Supreme Court held that section 3580 authorizes courts to include in their restitution calculus losses resulting only from conduct underlying the offense of conviction.
 
 
 17
 In Hughey, the petitioner was indicted on three counts of theft by a United States Postal Service employee and three counts of use of unauthorized credit cards. He pleaded guilty to count four in exchange for the government's dismissal of the remaining counts. Count four charged that the defendant used an unauthorized MBank Mastercard credit card issued to Hershey Godfrey. The total losses MBank sustained as a result of the unauthorized use of the Godfrey credit card was $10,412.00. During the plea proceeding, the government proffered evidence that the petitioner had stolen not only Godfrey's card, but at least 15 other cards.
 
 
 18
 The lower court ordered the petitioner to make restitution to MBank in the amount of $90,431.00. The Fifth Circuit Court of Appeals affirmed. The Supreme Court, however, reversed the Fifth Circuit's decision and rejected it's conclusion that the "VWPA permits a court to require restitution beyond that amount involved in the offense of conviction when there is a significant connection between the crime of conviction and similar actions justifying restitution." Id. at 416-419.
 
 
 19
 In the case before us, the district court ordered Jeffery to pay restitution in the amount of $32,000.00 to be shared proportionately by all un- or non-reimbursed victims, whether or not specifically named in the Indictment. Jeffery argues that the portion of the order which requires payment to non-count victims is erroneous under the VWPA and Hughey.
 
 
 20
 The government properly states that under Hughey, it is appropriate to focus on the conduct forming the basis of the offense of conviction when ordering restitution. The government contends, however, that the application of this standard in cases like conspiracy, mail fraud and wire fraud, where the crime is part of an ongoing scheme to defraud, allows the trial court to order restitution for actions made pursuant to the scheme, even if they are not specifically charged in the indictment.
 
 
 21
 Hughey compels a different result. Here, Mr. Jeffery was not charged, tried, or convicted of the offenses regarding victims to which the trial court ordered restitution. Jeffery was only charged with mail and wire fraud of particular victims. Even though a "scheme to defraud" is required in the proof of these charges, the government does not have to prove the existence of non-count victims to make its case.
 
 
 22
 To hold that restitution to those victims is valid would be to allow restitution for possibly unsubstantiated, unproven conduct in cases where the government has proven a scheme to defraud with respect to only a finite number of victims. This outcome is contrary to the Supreme Court's conclusion in Hughey that "Congress intended restitution to be tied to the loss caused by the offense of conviction." Hughey, 495 U.S. at 418.
 
 
 23
 For these reasons, we hold that when, as here, a conviction involves a conspiracy or scheme, restitution must be limited to the loss attributable to the specific conduct underlying the conviction.[1] Accordingly, we conclude that the district court erred in granting restitution to non-count victims.[2]
 
 V.
 
 24
 We AFFIRM Jeffery's convictions because the evidence was sufficient to support his conviction. In addition, we AFFIRM the trial court's application of the section 3C1.1 sentence enhancement. Finally, we VACATE the district court's sentencing order and REMAND this case for resentencing in accordance with the above instructions.
 
 
 
 *
 Honorable Clarence A. Brimmer, District Judge, United States District Court for the District of Wyoming, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel
 
 
 [1]
 Other circuits that have addressed the issue have reached the same conclusion. See, e.g., United States v. Stone, 948 F.2d 700, 704 (11th Cir.1991) (holding that where defendant pled guilty to one count of mail fraud and other counts were dismissed, the restitution order could not exceed the loss attributable to the specific conduct that formed the basis for the offense of conviction); United States v. Kane, 944 F.2d 1406, 1414-15 (7th Cir.1991) (holding that restitution "cannot be ordered for conduct with which the defendant is specifically charged and acquitted."); United States v. Sharp, 941 F.2d 811, 815 (9th Cir.1991) (stating that "[e]ven when the offense of conviction involves a conspiracy or scheme, restitution must be limited to the loss attributable to the specific conduct underlying the conviction."); United States v. Clark, 931 F.2d 292, 297 (5th Cir.1991) (holding that the defendant may only be held liable for restitution for losses arising from the counts to which he pled guilty)
 
 
 [2]
 Regardless of this decision, the total amount of restitution to be paid by Jeffery should not be reduced. The total loss specifically pled in the indictment amounts to $40,000.00 and the restitution order is for $32,000.00. Thus, this conclusion merely mandates reallocation of the restitution to be paid by Jeffery to those victims identified in the offenses of conviction