**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 15 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DAVID RAY GADDIS,

Defendant - Appellant.

No. 98-6273

(W.D. Oklahoma)

(D.C. No. CR-97-105-C)

**ORDER AND JUDGMENT** *

Before **ANDERSON** , **BRORBY** , and **BRISCOE** , Circuit Judges.

David Gaddis was convicted after a jury trial [1] of one count of conspiracy in violation of 18 U.S.C. §§ 2, 371, three counts of wire fraud in violation of 18 U.S.C. §§ 2, 1343, four counts of engaging in monetary transactions derived from unlawful activities in violation of 18 U.S.C. §§ 2, 1957(a), and one count of

---

*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[1]The district judge declared a mistrial in Gaddis' first trial. The jury found Gaddis guilty on all counts in his second trial.

money laundering in violation of 18 U.S.C. §§ 2, 1956(a)(1)(A)(i).  He was

sentenced to 46 months in prison, three years of supervised release, and payment

of $309,000 in restitution.   [2]  Mr. Gaddis appeals both his conviction and sentence

alleging as follows:  (1) the evidence was insufficient to sustain his conviction on

all counts; (2) the district court erred in allowing evidence of other bad acts under

Fed. R. Evid. 404(b); (3) for sentencing purposes the district court erred in

refusing to group his convictions for fraud and money-laundering under the

United States Sentencing Guidelines § 3D1.2; and (4) the testimony of David

Aitken should have been excluded because it was procured by an improper

gratuity from the prosecution.  We exercise jurisdiction pursuant to 28 U.S.C.

§ 1291 and 18 U.S.C. § 3742 and affirm.


## I. BACKGROUND

Mr. Gaddis' conviction arose from a partnership between Sears Roebuck

Company and Gaddis' company, International Service Co. (ISC).  The

partnership, Sears Commercial Installation Services (SCIS), was formed in 1991

and provided that Sears would market, and ISC would perform, commercial sign

installations.  The partnership established a billing procedure in which ISC would

---

[2]The restitution obligation is joint and several to that of co-conspirator
David Aitken.

invoice Sears for the cost of a project. Sears would subtract its commission of 10 to 15 percent and then wire funds to SCIS to pay the ISC invoice. The customer was then billed by Sears for the full amount and would pay Sears directly for the work. Gaddis worked with Sears through its employee, David Aitken.

Mr. Aitken believed that the partnership also had the potential to develop a "Smart House" home automation business. Aitken convinced Sears to loan the partnership $500,000 to be used to pay off ISC's debts and to develop the home automation business. The loan agreement also required that ISC provide Sears with monthly financial statements and that no portion of the loan proceeds was to be used to pay the salary of Gaddis or anyone related to him. On October 22, 1991, Gaddis received the loan proceeds and paid ISC's line of credit down from a balance of $160,000 to $5000. The same day Gaddis, on behalf of ISC, borrowed an additional $60,000 against the line of credit and deposited it in ISC's account. He then transferred the $60,000 into an account for Home Systems, Inc. (HSI), a corporation controlled by Gaddis and formed that same day. Gaddis prepared a corresponding invoice from HSI to ISC for $60,000 for research and development. The evidence shows that no research and development occurred. The next day Gaddis transferred $44,000 out of the HSI account to purchase a Corvette titled to Gaddis and his company, HSI.

By early 1992, ISC was experiencing financial difficulties and Gaddis and Aitken failed to secure additional funding from Sears. So, to keep ISC "afloat" Aitken suggested that Gaddis submit invoices to Sears "identical to the legitimate invoices" through the partnership billing procedure. Aplt. App. at 189, Tr. at 129. Thereafter, Gaddis sent weekly invoices to Sears through SCIS showing the customer as HSI (the corporation controlled by Gaddis). The invoices represented that "Installation Services" were performed for HSI although no services were performed. Aitken would approve Sears to pay the invoices, knowing that Installation Services did not occur. Count 1, conspiracy, is based on this invoice scheme agreement between Gaddis and Aitken.

Between March and September 1992, Sears wired a total of $324,000 to the SCIS partnership account to pay 24 separate invoices submitted by Gaddis for work never performed for HSI. Thus, under the partnership billing arrangement, Sears wired funds to the partnership for the invoices from ISC but the purported customer, HSI, failed to pay Sears. Gaddis claimed the funds were advances on future sales that HSI would repay to Sears when the Smart House work materialized. Counts 2 through 4, wire fraud, are based on these invoices inducing Sears to wire funds to SCIS. Gaddis would transfer these funds obtained by the invoices from the SCIS account to the ISC account. Counts 5 through 8,

money laundering, are based on this monetary transaction of alleged criminally derived property.

In June 1992, Aitken indicated to Gaddis that the first of the 24 invoice payments due from HSI to Sears would soon be 90 days delinquent, triggering Sears accounting department action. Thereafter, Gaddis transferred $15,000 from ISC to HSI and prepared a corresponding invoice from HSI to ISC in the amount of $15,000 for research and development. Again, the evidence shows that no such research and development occurred. Gaddis then directed a payment from HSI to Sears for $15,000 to pay the first invoice. [3] This payment delayed Sears discovery of the invoice scheme and allowed Gaddis to receive additional funds from Sears. Count 9, money laundering, is based on this transfer of $15,000 from ISC to HSI allegedly designed to conceal the source and ownership of the funds derived from unlawful activity.

In September 1992, Gaddis directed the preparation of an invoice from HSI to ISC for non-existent research and development in the amount of $345,000. Since ISC had no funds, the invoice was not paid but HSI listed the amount as a receivable. The indictment did not include charges related to the $500,000 loan in 1991 or the $345,000 invoice.

---

[3]Thus, after HSI's $15,000 payment to Sears, the damage from fraud, and restitution ordered, was $309,000 ($324,000 minus the $15,000 payment).

## II. DISCUSSION

*A. Sufficiency of the Evidence*

Mr. Gaddis argues that the evidence is insufficient to establish his intent to commit wire fraud and argues that because all nine counts of his conviction rest on wire fraud, [4] his conviction should be reversed on all counts. The crime of wire fraud consists of two elements: 1) a scheme or artifice to defraud or obtain money by false or fraudulent pretenses, representations, or promises; and 2) the use of interstate wire communications to facilitate that scheme. See United States v. Drake, 932 F.2d 861, 863 (10th Cir. 1991); 18 U.S.C. § 1343. "[A] scheme to defraud is conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension." United States v. Hanson, 41 F.3d 580, 583 (10th Cir. 1994).

Rarely is direct evidence of a defendant's intent available. "Intent can be proven, however, from surrounding circumstances." United States v. Johnson, 971 F.2d 562, 566 (10th Cir. 1992) (upholding jury inference of intent in wire fraud and money laundering conviction). See also United States v. Prows, 118 F.3d 686, 692 (10th Cir. 1997) (finding that intent may be inferred from a variety of circumstantial evidence including defendant's misrepresentations and whether

---

[4]Count 1, conspiracy, requires an agreement to defraud; Counts 2 through 4 are the wire fraud counts; and Counts 5 through 9, money laundering, require monetary transactions of funds acquired through the wire fraud.

defendant profited or converted money to his own use) (citing Kathleen Flavin & Kathleen Corrigan, Eleventh Survey of White Collar Crime: Mail Fraud and Wire Fraud, 33 Am. Crim. L. Rev. 861, 869-70 (1996)).

Applying these principles, we review the sufficiency of the evidence to support a jury verdict "de novo and ask only whether, taking the evidence–both direct and circumstantial, together with reasonable inferences to be drawn therefrom–in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. Voss, 82 F.3d 1521, 1524-25 (10th Cir. 1996) (internal quotation marks and citations omitted). Thus, here we review whether a jury could reasonably find from all the evidence that Gaddis intended a scheme to defraud or obtain money from Sears by false representations.

Mr. Gaddis asserts that the evidence failed to demonstrate that he intended to defraud Sears. He contends that he was properly conducting business in the manner legitimately authorized and directed by Aitken. He argues that he "understood these invoices to be payments in advance of future sales, after *Aitken's suggestion of this method* as a way to keep ISC afloat until the Smart House project came through . . . [and that he] acted reasonably in relying on Aitken's apparent authority to approve the invoices on Sears' behalf." Aplt. Br. at 17 (emphasis in original).

-7-

Viewing the evidence most favorably to the government, a jury could reasonably find otherwise. As indicated above, Aitken testified that he and Gaddis established and concealed an improper invoice scheme.[5] The 24 invoices prepared at Gaddis' direction listed "Installation Services" never performed and Gaddis used HSI (his other company–unknown to Sears) as the customer on the invoices. Gaddis transferred $15,000 from ISC to HSI so that HSI could make an overdue payment to Sears to avoid detection of the invoice scheme and in doing so, falsely represented the nature of the transfer by another false invoice for research and development. He also directed the preparation of an invoice from HSI to ISC in the amount of $345,000 for research and development shown to have never occurred. The jury also heard evidence that during the six-months of the false invoices, Gaddis and his wife received over $106,000 in salary and benefits from ISC while employees were asked to defer their salaries due to ISC's financial difficulties. This multitude of false invoices, fund transfers, and efforts

_____

[5]The following exchange is an example:

Q. [by Assistant U.S. Attorney Lillard] "And did you tell Gaddis whether anyone from Sears could know about this?"

A. [Aitken] ". . . I said that this had to be – it would be totally a secret because there is no way that I could get anyone to approve doing this. It was not legitimate to pass the invoice."

Aplt. App. at 185, Tr. at 125.

to conceal the identity and solvency of Gaddis' companies goes far beyond any plausible, legitimate business practice.

Thus, despite Gaddis' arguments that he did not realize that his actions constituted criminal fraud, a jury could reasonably find from all the evidence that Gaddis intended a scheme to defraud and/or to obtain money from Sears by false representations.

## B. Evidence of Other Bad Acts

Mr. Gaddis claims that the district court erred in allowing evidence of other bad acts under Fed. R. Evid. 404(b)[6]. We review a district court's decision to admit evidence, including under Fed. R. Evid. 404(b), only for abuse of discretion. See United States v. Grissom, 44 F.3d 1507, 1513 (10th Cir. 1995). Gaddis contends that the evidence of his Corvette purchase and other breaches of the loan agreement with Sears was prejudicial. To review the trial court's admission of the evidence,

> we apply a four-part test examining whether: (1) the prosecution
> offered the evidence for a proper purpose under Rule 404(b); (2) the
> evidence is relevant under Fed. R. Evid. 401; (3) the evidence's

---

[6]Fed. R. Evid. 404(b) provides in relevant part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . ."

probative value is not substantially outweighed by its potential for unfair prejudice under Fed. R. Evid. 403; and (4) the district court, upon request, gave a proper instruction limiting the jury's consideration of the evidence to the purpose for which it was admitted.

United States v. Segien, 114 F.3d 1014, 1022-1023 (10th Cir. 1997) (citing Huddleston v. United States, 485 U.S. 681, 691, 108 S. Ct. 1496, 1502, 99 L. Ed.2d 771 (1988)). We noted in Segien that Fed. R. Evid. 404(b) is a rule of "inclusion, rather than exclusion, unless the evidence is introduced for the impermissible purpose or is unduly prejudicial." Segien at 1022.

The government argues that the evidence was material and admissible for the proper purposes of showing Gaddis' motive, intent, knowledge, and the absence of mistake. We agree and find Gaddis' prior conduct relevant to these proper purposes. The similarity of conduct in the prior transactions shows that Gaddis knew how to hide his inappropriate use of Sears funds and how to create and use false invoices. The $60,000 invoice for non-existent research and development to purchase the Corvette is relevant to show the lack of mistake in the later 24 invoices for non-existent installation services to facilitate the $324,000 transfers from Sears. As we have noted, "[e]vidence of lack of mistake or accident is relevant in proving fraudulent intent, an element of . . . wire fraud." United States v. Litchfield, 959 F.2d 1514, 1519 (10th Cir. 1992). The district court did not abuse its discretion in finding that this evidence's probative value

-10-

was not substantially outweighed by unfair prejudice. See United States v. Reddeck , 22 F.3d 1504, 1508 (10th Cir. 1994) ("The trial court has broad discretion to examine whether the probative value of evidence substantially outweighs the danger of unfair prejudice."). Furthermore, we note that the court gave a proper limiting instruction to the jury. Thus, finding the four-part test satisfied, we cannot say the district court abused its discretion, and therefore affirm its evidentiary ruling.

*C. Grouping of Convictions for Sentencing Purposes*

Mr. Gaddis next argues that, under the United States Sentencing Guidelines, his convictions for fraud and money-laundering should be grouped to reduce his sentence. We review a district court's legal interpretation of the Sentencing Guidelines de novo, see United States v. Kunzman , 54 F.3d 1522, 1531 (10th Cir. 1995), and fact finding under the clear error standard, giving deference to the court's application of the Sentencing Guidelines to the facts, see United States v. Hargus , 128 F.3d 1358, 1364 (10th Cir. 1997). This issue is controlled by our prior cases. The Guidelines state: "All counts involving substantially the same harm shall be grouped together in a single Group." U.S.S.G. § 3D1.2. In United States v. Johnson , 971 F.2d 562, 575-576 (10th Cir. 1992), and Kunzman , 54 F.3d at 1530-31, we held that convictions for money

laundering and fraud may not be grouped under section 3D1.2 for sentencing purposes because they involve different harms and different victims. We, of course, are bound by circuit precedent [7] as was the district court, who correctly ruled on this issue.

*D. Testimony of Co-conspirator*

Mr. Gaddis last argues that testimony by Aitken was procured by an "improper gratuity" from the government, and therefore should have been excluded. Gaddis failed to raise this issue below. Further, our en banc decision in <u>United States v. Singleton</u>, 165 F.3d 1297 (10th Cir.) (en banc), <u>cert. denied</u>, -- U.S. ----, 119 S. Ct. 2371, -- L. Ed.2d ---- (1999), disposes of the argument.

---

[7]As we noted in <u>United States v. Allen</u>, 129 F.3d 1159, 1167 (10th Cir. 1997), circuits have disagreed on grouping such related offenses. <u>See</u> <u>United States v. Napoli</u>, 179 F.3d 1, 7 (2d Cir. 1999) (examining and citing deep circuit split and holding that fraud and money laundering counts should not be grouped).

### III. CONCLUSION

For the reasons set forth above, Gaddis' conviction and sentence are hereby AFFIRMED.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge