Gideon Pelores **LYDA**, alias **G. P. Lyda**, Appellant,

v.

**UNITED STATES of America,** Appellee.

No. 18131.

United States Court of Appeals Fifth Circuit.

June 15, 1960.

Jack Garey, Austin, Tex., for appellant.

K. Key Hoffman, Asst. U. S. Atty., Russell B. Wine, U. S. Atty., Arthur Luethcke, Asst. U. S. Atty., San Antonio, Tex., for appellee.

Before CAMERON, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The principal question here is the meaning to be attributed to "stolen" as it defines property, the interstate transportation of which is a crime under the

Interstate Transportation of Stolen Property Act, 18 U.S.C.A. § 2314. Subsidiary to that are problems concerning the sufficiency of the indictment. The case comes to us after conviction on a two-count indictment. Count one charged Lyda and another (Malone) with transportation in interstate commerce of "stolen goods and merchandise to-wit, a load of native pecans * * * [knowing the same] to have been stolen." The sentence on this was ten years. Count two, under 18 U.S.C.A. § 371, charged Lyda and Malone with conspiracy to transport in interstate commerce "stolen goods and merchandise." The sentence, to be served concurrently, on this was five years. Validity of the conviction for the substantive offense under count one is therefore inescapably presented.

The statute [1] defines as a crime the interstate transportation of "goods, wares, merchandise, securities or money" of a stated value knowing such items "to have been stolen, converted or taken by fraud."

On the trial Lyda, sole appellant here, moved for a judgment of acquittal, F.R. Crim.P. 29, 18 U.S.C.A., on the ground that there was no evidence of transportation of "stolen goods" since there was "no unlawful taking which would constitute the offense of theft." Raised squarely, then, is the basic issue whether "stolen" comprehends more than common law larceny. If, as did the trial court, we hold "stolen" encompasses all felonious, unlawful takings with intent to deprive the owner of the rights and benefits of ownership regardless of whether or not the theft constitutes common law larceny, Lyda next contends that the indictment was insufficient to charge a crime since it should have set forth the facts showing the particular kind of actions giving the property the quality of "stolen."

In view of the fundamental attack on the construction of the statute, we need not discuss the evidence in any detail. Lyda was a truck driver working for or with Malone. Both lived in Texas. Malone was the owner of a tractor-trailer. Lyda's compensation was an equal division of net freight revenues earned by the unit after first deducting direct operating expenses. They were operating as a free lance, unregulated interstate motor carrier of exempt commodities presumably under 49 U.S.C.A. § 303(b) (6). See American Trucking Associations v. United States, 1953, 344 U.S. 298, 73 S. Ct. 307, 97 L.Ed. 337; East Texas Motor Freight Lines, Inc. v. Frozen Food Express, 1956, 351 U.S. 49, 76 S.Ct. 574, 100 L.Ed. 917. Business was apparently ac-

---

1. We are concerned with the first paragraph of 18 U.S.C.A. § 2314 which provides:

"Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud, * * *."

To show the full sweep of the statute, we set forth the balance which provides:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person to travel in, or to be transported in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more; or

"Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities, knowing the same to have been falsely made, forged, altered, or counterfeited; or

"Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce, any tool, implement, or thing used or fitted to be used in falsely making, forging, altering, or counterfeiting any security, or any part thereof—

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

"This section shall not apply to any falsely made, forged, altered, counterfeited or spurious representation of an obligation or other security of the United States, or of an obligation, bond, certificate, security, treasury note, bill, promise to pay or bank note issued by any foreign government or by a bank or corporation of any foreign country."

quired through brokers who, for a fee, brought together shippers of such exempt commodities and unregulated carriers.

Lyda and Malone were together in Louisiana. They were strapped for cash and want of business. One or two promised cargoes had not materialized. Malone returned to Texas. Lyda, using the name Billy Joe Davis, was in touch with a broker in Thomasville, Georgia, by long distance telephone. This broker informed Billy Joe Davis (Lyda) that a cargo of pecans was to be picked up at Valley Farms Co-op at Natchitoches, Louisiana for transportation to Goldkist at Waycross, Georgia. Lyda went to Valley Co-op where, after loading the full cargo of bagged pecans, he signed the shipping documents as Billy Joe Davis. Lyda, truck and pecans then left Natchitoches ostensibly bound for Georgia. But if Georgia ever were the intended destination it soon ceased to be. Trouble, a combination of mechanical breakdowns and insufficient cash, was asserted as the cause. But whether it was this or an original illegal purpose to expropriate the pecans, the turning point was Alexandria, Louisiana. Alexandria is approximately 60 miles southeast of Natchitoches. On arrival there Lyda called Malone, then in Texas, by long distance. The two agreed by telephone that the pecans should come to Texas. The plan was not new, but it had a few novel twists. To get badly needed cash to finance repairs to the truck and to pay off other pressing obligations, they would sell the pecans in Texas, use the surplus proceeds to purchase a load of perishable fruits in the Texas Valley, transport them to Chicago for sale at a profit, and use those proceeds to reimburse the Georgia pecan consignee for his lost pecans. Notwithstanding considerable mechanical difficulty with the truck, the plan worked in part. Beginning with the small sale at Houston and ending with a large scale disposal of the balance of the load at San Antonio,

Malone, with Lyda assisting, sold and delivered all of the pecans for about $10,000. Whether Lyda was entitled to, or did in fact, keep the fruits of one check for $3,000 made payable to him was disputed but hardly significant. In his testimony, he candidly admitted that he expected Malone to pay him a fair "salary" for this trip, and he knew this would come from the fruits of this expropriation. Before they could purchase the fruit to be transported to Chicago to be sold to bail them out with the Georgia pecan owner, Malone succumbed to a dice game. Now there were no pecans, no fruit and no money. But there still was trouble.

Lyda does not, nor could he, successfully deny the sufficiency of the evidence to support the inferences that the transportation of the pecans to Alexandria, Louisiana to Texas was interstate and was known by Lyda to be unauthorized, in violation of his duty as a carrier and therefore wrongful. But he insists the decision to move the goods west to Texas, not east to Georgia, for sale, not delivery to the rightful consignee, was embezzlement. The next step is his earnest contention that it is transportation of *stolen* goods, not embezzled goods, which is forbidden and stolen comprehends only larceny, that is, an unlawful taking.

In determining this question, we may for our purposes assume what the jury perhaps did not—that the intention to appropriate the pecans did not come into being until the truck got to Alexandria— that is, that when initially received, it was the purpose to carry and deliver the goods to Georgia. For it is our view that if this subsequent action is regarded as embezzlement by one having lawful custody, this nevertheless made the goods "stolen" at and before the interstate transportation to Texas commenced.

■ This Court in an opinion which has received continued approbation long ago pointed out the broad meaning of "stolen." [2] "Stealing, having no common

2. Crabb v. Zerbst, 5 Cir., 1938, 99 F.2d 562; cited with approval in Morissette v. United States, 1952, 342 U.S. 246, footnote 28, 72 S.Ct. 240, 96 L.Ed. 288, 302–303, and United States v. Turley, 1957, 352 U.S. 407, footnote 9, 77 S.Ct. 397, 1 L.Ed.2d 430, 434.

law definition to restrict its meaning as an offense, is commonly used to denote any dishonest transaction whereby one person obtains that which rightfully belongs to another, and deprives the owner of the rights and benefits of ownership, but may or may not involve the element of stealth usually attributed to the word *purloin.*" Crabb v. Zerbst, 5 Cir., 1938, 99 F.2d 562, 565.

This and related considerations including the statutory development of this Act traced briefly in United States v. Handler, 2 Cir., 1944, 142 F.2d 351, have led courts to declare that "stolen" is not confined to the common law crime of larceny. United States v. De Normand, 2 Cir., 1945, 149 F.2d 622. As Judge, now Mr. Justice, Stewart pointed out, "the issue as to whether the goods were obtained by one of the unlawful methods of acquisition referred to in the statutes is not to be decided upon the basis of technical common law definition." Bergman v. United States, 6 Cir., 1958, 253 F.2d 933, at page 935. The term "stolen" as used here is certainly as comprehensive as "theft" which, we have said, "is not like 'larceny', a technical word of art with a narrowly defined meaning but is, on the contrary, a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile." Edwards v. Bromberg, 5 Cir., 1956, 232 F.2d 107, 110, 62 A.L.R.2d 565.

All that the Court said and did in United States v. Turley, 1957, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430, bears directly on this problem. It repeated with approval what the Fourth Circuit had earlier said in Boone v. United States, 4 Cir., 1956, 235 F.2d 939, 940, "But while 'stolen' is constantly identified with larceny, the term was never at common law equated or exclusively dedicated to larceny." 352 U.S. 407, at pages 411–412, 77 S.Ct. at page 399, 1 L.Ed.2d 430, 433. With respect to the Dyer Act, 18 U.S.C.A. § 2312, it concluded that " 'stolen' * *

includes all felonious takings * * * with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny." 352 U.S. 407, at page 417, 77 S.Ct. at page 402, 1 L.Ed.2d 430, 436.

While we need not here draw upon the adjacent terms of "converted or taken by fraud" as they appear in § 2314, see note 1, supra, we think their presence is relevant. The aim of the statute is, of course, to prohibit the use of interstate transportation facilities for goods having certain unlawful qualities. This reflects a congressional purpose to reach all ways by which an owner is wrongfully deprived of the use or benefits of the use of his property. It was one way to meet the difficulties in legislative draftsmanship. The experience with this Act, the Dyer Act, and others bears witness that "what has concerned codifiers of the larceny-type offense is that gaps or crevices have separated particular crimes of this general class and guilty men have escaped through the breaches." Morissette v. United States, 1952, 342 U.S. 246, at page 271, 72 S.Ct. 240, at page 254, 96 L.Ed. 288, at pages 304–305. Congress by the use of broad terms was trying to make clear that if a person was deprived of his property by unlawful means amounting to a forcible taking or a taking without his permission, by false pretense, by fraud, swindling, or by a conversion by one rightfully in possession, the subsequent transportation of such goods in interstate commerce was prohibited as a crime. Since the aim of Congress was to reach all such deprivations, it would distort that purpose if by a sort of reverse process the transaction under review had to consider whether the property was stolen *or* converted *or* taken by fraud. The contiguous presence of all three descriptives lends meaning to each.

Little need be said of the indictment. It charged transportation in interstate commerce of "stolen goods and merchandise * * * a load of native pecans * * * which * * * Malone and * * * Lyda then knew * * *

to have been stolen." The term "stolen" as we have discussed at length comprehended an embezzlement. This identified adequately the goods, the interstate transportation, and the quality of the goods as being "stolen" which, by operation of law included embezzlement. There was thus a sufficient allegation of the essential elements of the offense. F. R.Crim.P. 7(c); Padilla v. United States, 5 Cir., 1960, 278 F.2d 188; Cefalu v. United States, 10 Cir., 1956, 234 F.2d 522, 524. If further details are needed, the remedy is by motion for a bill of particulars, F.R.Crim.P. 7(f). No such motion was asserted here, nor could any abuse of discretion as a matter of plain error be found in this record since all of the significant facts brought out on the trial were contained in Lyda's oral and written statements to the F.B.I. The indictment alleged that the goods were "stolen." It did not allege that they had been "converted" nor did it allege that they had been "taken by fraud." Had all of the statutory words been used in the disjunctive, this clearly would have been adequate as we held in Johnson v. United States, 5 Cir., 1953, 207 F.2d 314. We may assume, without deciding, that leaving out the additional terms "converted" or "taken by fraud" restricted the case. But we do not here have to determine whether, under an indictment charging "stolen" goods only, it would be sufficient merely to show acts which would amount to a conversion, but not one of the wrongful appropriations broadly included in the statutory term "stolen." Here the evidence showed embezzlement. The embezzlement occurred by an expropriation of the goods by one having initial lawful custody as a carrier. But this was more than mere conversion. See Morissette v. United States, supra, 342 U.S. 246, at pages 271–272, 72 S.Ct. 240, at page 254, 96 L.Ed. 288, at page 305.

This case concerns goods which were embezzled by persons having custody of them as a common carrier. The indict-

ment describing the goods as "stolen" was adequate to allege embezzlement and the proof was abundant.

Affirmed.