UNITED STATES of America, Appellee,

v.

Harry Levine BENSON et al.,
Defendants-Appellants.

Nos. 540, 541 and 544, Dockets 76–1404,
76–1412 and 76–1419.

United States Court of Appeals,
Second Circuit.

Argued Dec. 16, 1976.

Decided Jan. 6, 1977.

Certiorari Denied Feb. 28, 1977.
See 97 S.Ct. 1185.

Allan Levine, Asst. U. S. Atty., New
York City (Robert B. Fiske, Jr., U. S. Atty.,
S. D. N. Y., Audrey Strauss, Asst. U. S.

Atty., New York City, of counsel), for appellee.

Gilbert Epstein, New York City (Stokamer & Epstein, New York City), for defendant-appellant Benson.

Gretchen W. Oberman, New York City, for defendant-appellant Kaminsky.

Phylis S. Bamberger, New York City (William J. Gallagher, Legal Aid Society, New York City), for defendant-appellant Danise.

Before MULLIGAN, TIMBERS and VAN GRAAFEILAND, Circuit Judges.

MULLIGAN, Circuit Judge.

The appellants Herbert Kaminsky and Harry Levine Benson were convicted on June 2, 1976 after a jury trial before the Hon. Charles H. Tenney, United States District Court for the Southern District of New York, on three counts of an indictment charging 1) conspiracy to defraud, 2) the use of a wire communication in interstate and foreign commerce in the execution of the scheme to defraud, and 3) inducing an individual to travel in interstate and foreign commerce in the execution of a scheme to defraud in violation of 18 U.S.C. §§ 371, 1343 and 2314. The defendant Mari-Ann Danise was found guilty on the two substantive counts but the jury was unable to reach a verdict as to her on the conspiracy count. The convictions are affirmed.

The victim of the swindle was one Hans Buhler, a Swiss diamond merchant, who brought to the United States two precious stones, a 9.88 carat diamond and a 8.35 carat emerald which together were valued at more than $200,000. Kaminsky and Danise obtained possession of the diamond from Buhler in New York on the pretext that they wished to have it appraised and shown to a prospective customer. Buhler received in exchange a cash memorandum receipt.

The defendant Benson was then introduced to Buhler by Kaminsky as the purported buyer. Buhler thereupon gave the emerald to Kaminsky as a commission for the sale. He never saw either stone again. The defendants through a series of false representations then induced Buhler to make trips to Chicago, London, Zurich, New York and Las Vegas. The well-travelled Buhler was unable to recover either the stones or the purchase price and finally realizing that he was the victim of a fraudulent scheme, advised the Federal Bureau of Investigation.

Appellants raise a variety of points on appeal which we consider to be meritless. However, one issue apparently has never been litigated or discussed since there is no reported federal opinion directly in point. Although the indictment named Buhler as the owner of the precious stones and the Government maintained this position throughout the trial, appellants argue that Buhler's claim that he purchased the diamond from a private party through one Werner Barth, a Zurich jeweler, was false and that the court below abused its discretion in failing to grant a continuance during the trial so that Barth's deposition could be obtained in Switzerland. Appellants had interviewed but not deposed Barth in Switzerland and he indicated that he had not sold any 9.88 carat diamond to Buhler. Appellants urge that a conviction under 18 U.S.C. § 2314 cannot be properly obtained unless the Government can establish that the property obtained by the false pretenses of the defendants was lawfully owned by the person defrauded.

Appellants urge that the second paragraph of section 2314 [1] which is here relevant was enacted by Congress in 1956 to protect "honest citizens" and that the Barth deposition would establish that Buhler had no title to the diamond and that he in fact was a jewel thief not within the ambit of

---

1. The relevant paragraph of 18 U.S.C. § 2314 provides:

   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person to travel in, or to be transported in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more . . . .

the statute. The legislative history of the statute depended upon by appellants [2] indicates that Congress was concerned that the victims of confidence men included "retired persons, widows and also business and professional men," but of course Congress was also concerned that "our laws must be kept at a peak level of effectiveness in order to deal with these criminals." It would hardly comport with this congressional concern were we now to exculpate confidence men who prey upon citizens (or even aliens) whose character is suspect. We cannot reasonably or fairly interpret the broad congressional concern for the honest citizen expressed in the House Report cited in footnote 2 to support a congressional intent that others are fair game for the swindler. It is accepted that the prostitute may be raped, the burglar's home burgled, the killer murdered and the thief a victim of larceny. Such a restricted and unusual interpretation of section 2314 as urged by appellants would have to be demonstrated by clear language in the statute itself and there is nothing on its face or in the legislative history to support the strained reading urged upon us. While it is generally held in a civil suit where both parties are guilty of criminal behavior with respect to the cause sued upon, that the court will leave the parties where it finds them and refuse to act as a referee among thieves, a criminal action is on a manifestly different footing. Buhler is not the plaintiff here. The United States has brought a criminal proceeding against defendants alleged to have engaged in a crude swindle which induced Buhler to travel in interstate and foreign commerce. Buhler's gullibility or his own criminal background is not relevant to the inquiry as to whether the defendants were properly convicted under section 2314.

Appellants only authority for this position, aside from the legislative history which we have recited, consists of two ancient New York cases, McCord v. People, 46 N.Y. 470 (1871) and People v. Tompkins, 186 N.Y. 413, 79 N.E. 326 (1906), both of which involved victims of confidence men who were induced to part with property in exchange for the performance of an illegal act. These cases are not in point since Buhler parted with the diamond expecting it to be appraised and shown to a bona fide customer. He surrendered the emerald to pay a commission for what he was led to believe was a lawful sale. In any event, in Tompkins the court reluctantly followed McCord indicating that at least 12 other states had rejected the narrow New York view which even then was too restricted to permit the practical administration of criminal justice. People v. Tompkins, supra, 186 N.Y. at 416, 79 N.E. at 327.

Appellants also argue that under these cases and generally in the states, a defendant could not be properly convicted of the crime of obtaining property by false pretenses unless the victim was persuaded to part with title to the goods. If he was merely deprived of possession, he could only be properly charged with the common law crime of larceny by trick.[3] Since it is claimed that Buhler did not have title to the jewels, appellants urge that he could not be properly convicted under section 2314. The appellants are correct in their appraisal of the common law distinctions which did exist among the various types of theft. However, their reliance on them today is without any justification.

The states generally have abolished the distinctions which had existed among the crimes of obtaining property by false pre-

**2.** Appellants cite the following language from H.R.Rep. No. 2474, reprinted in 1956 U.S.Code Cong. and Admin.News 3036, 3038:

Each year many of our citizens are cheated by confidence men. As observed in the Attorney General's communication to the Congress, in many instances the targets of these unscrupulous criminals have been retired persons, widows and also business and professional men. These people lose large sums of money to this group of criminals. The committee is of the firm conviction that our laws must be kept at a peak level of effectiveness in order to deal with these criminals, and protect honest citizens from their operations.

**3.** People v. Barnett, 31 Cal.App.2d 173, 88 P.2d 172 (Dist.Ct.App.1939); People v. Noblett, 244 N.Y. 355, 155 N.E. 670 (1927); Whitmore v. State, 238 Wis. 79, 298 N.W. 194 (1941).

tenses, larceny by trick, embezzlement and larceny by trespass. These distinctions which bedeviled prosecutors, law students and even law professors have long since disappeared. See generally Fletcher, The Metamorphosis of Larceny, 89 Harv.L.Rev. 469 (1976); Goodhart, The Obsolescent Law of Larceny, 16 Wash. & Lee L.Rev. 42 (1959). In New York the distinctions have been obsolete since 1942.[4] They are similarly extinct in federal jurisprudence.

In *Morissette v. United States*, 342 U.S. 246, 272–73, 72 S.Ct. 240, 254, 96 L.Ed. 288 (1952), Mr. Justice Jackson extensively reviewed the underlying federal larceny statutes codified in 18 U.S.C. § 641. After noting that the states had generally abolished the distinctions among the various types of theft, he concluded that "[t]he purpose which we here attribute to Congress parallels that of codifiers of common law in England and in the States and demonstrates that the serious problem in drafting such a statute is to avoid gaps and loopholes between offenses." (footnotes omitted).

Again in *United States v. Turley*, 352 U.S. 407, 412–13, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957), the Court gave a broad construction to the term "stolen" in the National Motor Vehicle Theft Act (18 U.S.C. § 2312) and rejected the view of those circuit courts which would have limited the term to common law larceny.

More directly in point is *Lyda v. United States*, 279 F.2d 461 (5th Cir. 1960), where the court was called upon to construe the first paragraph of 18 U.S.C. § 2314.[5] The defendant urged that the term "stolen" goods should be interpreted restrictively to cover only a case where the taking of the property was unlawful (common law larceny by trespass) and not one where the property was surrendered to the defendants who later converted it (embezzlement). The court rejected the argument, relying in part upon Mr. Justice Stewart's opinion in *Bergman v. United States*, 253 F.2d 933, 935 (6th Cir. 1958), where the then Circuit Court Judge held, "The issue as to whether the goods were obtained by one of the unlawful methods of acquisition referred to in the statutes is not to be decided upon the basis of technical common law definitions."

In *Lyda* Judge Brown, while holding that the phrase "converted or taken by fraud" in section 2314 need not be interpreted under the facts in that case, nonetheless observed, 279 F.2d at 464:

> The aim of the statute is, of course, to prohibit the use of interstate transportation facilities for goods having certain unlawful qualities. This reflects a congressional purpose to reach all ways by

---

4. The addition of § 1290 to the former New York Penal Law in 1942 eliminated the common law distinctions among the various forms of theft by the following definition of larceny:

> A person who, with the intent to deprive or defraud another of the use and benefit of property or to appropriate the same to the use of the taker, or of any other person other than the true owner, wrongfully takes, obtains or withholds, by any means whatever, from the possession of the true owner or of any other person any money, personal property, thing in action, evidence of debt or contract, or article of value of any kind, steals such property and is guilty of larceny.

The section eliminated the defense that:

> 2. The accused in the first instance obtained possession of, or title to, such property lawfully, provided he subsequently wrongfully withheld or appropriated such property to his own use or the use of any person not entitled to the use and benefit of such property . . . . .

The Historical Note, Laws 1942, ch. 732, § 1, makes this legislative intent clear:

> It is hereby declared as the public policy of the state that the best interests of the people of the state will be served, and confusion and injustice avoided, by eliminating and abolishing the distinctions which have hitherto differentiated one sort of theft from another, each of which, under section twelve hundred and ninety of the penal law, was denominated a larceny, to wit common law larceny by asportation, common law larceny by trick and device, obtaining property by false pretenses, and embezzlement.

See New York Penal Law § 155.05.

5. The first paragraph of § 2314 provides:

> Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud . . . . .

which an owner is wrongfully deprived of the use or benefits of the use of his property. It was one way to meet the difficulties in legislative draftsmanship. The experience with this Act, the Dyer Act, and others bears witness that "what has concerned codifiers of the larceny-type offense is that gaps or crevices have separated particular crimes of this general class and guilty men have escaped through the breaches." *Morissette v. United States*, 1952, 342 U.S. 246, at page 271, 72 S.Ct. 240, at page 254, 96 L.Ed. 288, at pages 304–305. Congress by the use of broad terms was trying to make clear that if a person was deprived of his property by unlawful means amounting to a forcible taking or a taking without his permission, by false pretense, by fraud, swindling, or by a conversion by one rightfully in possession, the subsequent transportation of such goods in interstate commerce was prohibited as a crime. Since the aim of Congress was to reach all such deprivations, it would distort that purpose if by a sort of reverse process the transaction under review had to consider whether the property was stolen *or* converted *or* taken by fraud. The contiguous presence of all three descriptives lends meaning to each.

■ In light of these holdings, it is evident that section 2314 cannot be properly interpreted to limit its application to the ancient statutory crime of obtaining property by false pretenses.

■ Secondly, the language of section 2314 here relevant itself simply condemns the inducing of "any person to travel in . . . interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more."

There is no language in the paragraph which requires that the victim actually be deprived of any property at all—the scheme or artifice need only induce the travel not the loot. Hence the statute cannot be truly analogous to either common law larceny by trick or obtaining property by false pretenses. Buhler's title to the gems thus becomes irrelevant. While proof of his surrender of them to the defendants assists the Government in establishing the scheme and intent of the defendants, the loss of property is not part of the corpus delicti of the crime in paragraph 2 of section 2314. Hence, the Government's consistent position that Buhler *actually owned the gems* was not necessary to its case and actually created the diversion which prompted this appeal.

This construction of section 2314 is consistent with our prior interpretation of the mail fraud statute, 18 U.S.C. § 1341. In *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180–81 (2d Cir. 1970), we held that no proof that the victim of the swindle was actually defrauded or suffered any loss was necessary. The close relationship between the mail fraud statute and the second paragraph of section 2314 has been made clear by Congress.[6] The wire fraud statute, 18 U.S.C. § 1343, has also been construed to require no proof that the intended victim was actually defrauded or suffered loss. "To hold otherwise would lead to the illogical result that the legality of a defendant's conduct would depend on his fortuitous choice of a gullible victim." *United States v. Pollack*, 534 F.2d 964, 971 (D.C.Cir. 1976).

■ Appellants argue that Barth's testimony, as well as other evidence which might establish that his title to the gems was suspect, should have been admitted be-

6. H.R.Rep. No. 2474, 1956 U.S.Code Cong. and Admin.News 3036, 3038 states the intent of Congress to fill the interstices left by the mail fraud statute with the second paragraph of § 2314 in the following language:

In combating this sort of criminal activity, the Department of Justice has found that our present Federal laws are inadequate when it comes to dealing with the criminal who uti-

lizes travel by the victim in the perpetration of the scheme to defraud that individual of his money. Such criminals avoid prosecution under the mail fraud statutes (sec. 1341 U.S.C., title 18) by not using the mails. . .

This proposed legislation is intended to remedy this present lack in the law. . . .

low in any event to impeach Buhler's credibility. We cannot agree. Aside from the fact that the United States Attorney has represented that a phone call to Barth indicated that he would not speak about the matter and wanted to have nothing to do with it, Buhler's credibility was very much in issue. The Government stipulated on trial that Buhler had not declared the gems upon his entry to the United States. Buhler's extensive criminal record including two convictions for embezzlement in Switzerland was placed before the jury. The defendants argued to the jury that he was a smuggler and a jewel thief. Obviously the jury found that he was the victim of a swindle and we find no abuse of discretion below in either denying the continuance or in refusing to admit other collateral cumulative material reflecting on his credibility. *United States v. Frattini*, 501 F.2d 1234, 1237 (2d Cir. 1974); *United States v. Barrera*, 486 F.2d 333, 339 (2d Cir. 1973), cert. denied, 416 U.S. 940, 94 S.Ct. 1944, 40 L.Ed.2d 291 (1974).

Affirmed.