UNITED STATES of America,
Appellee,

v.

Wade THOMAS, Defendant—Appellant.

No. 02–1029.

United States Court of Appeals,
Second Circuit.

Argued: Dec. 4, 2003.

Decided: July 28, 2004.

William M. Bloss, Jacobs, Grudberg, Belt & Dow, P.C., New Haven, CT, for Defendant–Appellant.

Barbara Underwood, Assistant United States Attorney, of counsel, for the Eastern District of New York, Catherine L. Youssef, Assistant United States Attorney, of counsel, for the Eastern District of New York (Roslynn R. Mauskopf, United States Attorney, and Peter A. Norling, Assistant United States Attorney, of counsel), Brooklyn, NY, for Appellee.

Before: CARDAMONE, SACK, and JOHN R. GIBSON,* Circuit Judges.

GIBSON, Circuit Judge.

Wade Thomas appeals from his conviction of inducement of travel in interstate commerce for a fraudulent purpose, in violation of 18 U.S.C. § 2314. Thomas argues that there is insufficient evidence to sustain the conviction, that the district court erred in instructing the jury and in restricting the cross-examination of the victim, and that the prosecutor made improper statements in her summation. We affirm.

In 1996, Dannie Holmes was the pastor of the Greater Hope Baptist Church, located in a low-income area of Memphis, Tennessee. Wishing to make improvements to the church, Pastor Holmes began preparations to build a family life center. The plans called for a gym, a fellowship hall, office space, classrooms, a kitchen, and day-care facilities. The estimated cost of the project was at least $1.3 million. Because the church only had about $20,000 in its account at that time, it needed outside financing to fund the project.

Pastor Holmes had no training in finance, so for several years he had employed Robert Mukes, president of Mukes Management Company, to assist him in making the church's financial decisions and to provide financial services for the church. Mukes had incorporated the church as a tax-exempt organization and had assisted in purchasing and renovating a house for a needy congregant. Mukes reconciled the church's books every month and the church paid him a regular monthly salary.

Pastor Holmes hired Mukes to secure the outside financing needed to fund the family life center project. If Mukes was successful, he would be paid 4% of the loan amount, in addition to his usual salary. Mukes prepared a business loan package to present to local banks, in which he proposed to restructure the church's current mortgage and borrow funds to build the family life center. Because the church's cash assets were less than the amount the banks required to secure the requested loan amount, Mukes was unable to obtain loans large enough to cover the estimated cost of the project from Memphis banks.

Continuing to seek financing on behalf of the church, Mukes's inquiries eventually led him to Wade Thomas, a self-described financial consultant in New York City. Thomas told Mukes that he could secure financing for the church through a no-risk, high-yield investment program. Because Mukes was not familiar with the type of program and did not fully understand it, he asked Thomas to come to Memphis to

* The Honorable John R. Gibson, Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

explain the program in further detail. Thomas replied that he could not leave New York and suggested instead that Mukes come to New York to meet with him. Mukes agreed.

In May of 1996, Mukes flew from Memphis to New York City to meet with Thomas. At the meeting, Thomas explained the program to Mukes as a high-yield investment plan in which Thomas would pool a group of clients and use the "proof of funds"[1] from their respective financial institutions to secure a line of credit. Thomas would then take that line of credit and invest it, and return a portion of the profit from the investments to the clients who participated in the program. Thomas claimed that the program would secure $2 million for the church. Thomas told Mukes that because he needed only a "proof of funds" to secure the line of credit rather than the cash itself, there was absolutely no risk to the church's money at any time. Mukes told Thomas that he was interested in the program, but that the final decision was not his to make. He invited Thomas to come to Memphis to meet with Pastor Holmes.

A few weeks later, Thomas traveled to Memphis and met with Mukes and Pastor Holmes in Mukes's office. Thomas again explained the program, stating repeatedly that the church's money would never be at risk. Feeling the pressure from his congregation to get the family life center built, trusting Mukes's advice that he should consider the offer, and believing Thomas's representation that there was no financial risk to the church by participating in the program, Pastor Holmes agreed to proceed.

To participate in the program, Thomas required that the proof of funds show that $100,000 was in the church's account. However, the church only had about $20,000, raised by offerings from the congregation, in its account at that time. To cover the difference, Pastor Holmes took $80,000 out of his personal retirement account and put it into the church's account. To avoid losses on the retirement funds, Pastor Holmes had to return the $80,000 to his pension account in thirty days. Thomas assured him that the retirement money, along with the $2 million profit for the church, would be back within that time.

Once the $100,000 was in the church's account and the church was supposedly participating in the program, Thomas told Pastor Holmes that he was having trouble "getting the returns to flow" to Union Planters Bank in Memphis, where the church's account was located. Thomas asked Pastor Holmes to wire the $100,000 to Chemical Bank in New York City, repeatedly reassuring him that the money was still safe. Against Mukes's advice, Pastor Holmes transferred the money.

Thomas did not return Pastor Holmes's retirement funds within the thirty days. Months began to pass without the return of the church's original investment or the promised profits. As Pastor Holmes began to question where the church's money was, Thomas repeatedly urged him to be patient and assured him that the money was on its way. Thomas buttressed these assurances with various documents that made it appear that the program was working and Thomas had plenty of money at his disposal. For example, he sent Pastor Holmes what purported to be a $110 million Japanese bond. The government offered proof at trial that the bond was

---

**1.** Thomas explained that a proof of funds was a bank's identification of how much money was in a particular account.

fraudulent. Thomas sent a letter purporting to be from the First Union National Bank stating that Thomas had $7 million "under management certificate of deposit." Thomas admitted to an FBI Agent that parts of the letter were misleading. To support his claim that the church could soon expect its $2 million return, Thomas sent a letter on the stationery of U.S. Clearing Corporation, a stock clearing house. Again, the government offered proof that the stationery was forged.

Despite Thomas's many reassurances and promises, the church never saw the return of its initial investment or the promised profits. In actuality, Wade Thomas took the $100,000, formed from a combination of Pastor Holmes's pension fund and contributions by congregants of the church, and transferred it to his personal account as well as other accounts and wrote personal checks to family members.

Thomas was indicted in the Eastern District of New York for a single count of inducing another to travel in furtherance of a scheme to defraud, in violation of 18 U.S.C. § 2314. He was tried in front of a jury and Judge Reena Raggi. Thomas's defense was that the money was lost as a result of a business deal gone bad, not intentional fraud. After the jury returned a guilty verdict, Judge Raggi sentenced Thomas to fifty-one months in a federal prison followed by three years of supervised release, fined him $75,000, and ordered $100,000 restitution. This appeal followed.

## I.

Thomas's first claim on appeal is that a proper construction of the statute does not cover his conduct in this case. The second paragraph of 18 U.S.C. § 2314 prohibits inducing another to travel in furtherance of a fraud, or "travel fraud." Section 2314 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000 or more [shall be fined or imprisoned, or both].

In order to convict Thomas of travel fraud, the government had to prove two elements: (1) that the defendant devised a scheme intending to defraud a victim of money or property of a minimum value of $5,000, and (2) that as a result of this scheme, a victim was induced to travel in interstate commerce. *United States v. Myerson*, 18 F.3d 153, 164 (2d Cir.1994). At oral argument, Thomas conceded that under the facts of this case, a jury could reasonably find a scheme to defraud. He also conceded in his brief that either Pastor Holmes or the Greater Hope Baptist Church could be classified as the victims of his fraudulent scheme. He argues that there was insufficient evidence of the victim's travel and that the district court erred in its instruction on this issue. He also asserts that there was insufficient evidence of inducement.

## A.

■ Basic to Thomas's arguments regarding the victim's travel is an issue inherent in each. Both Thomas and the government agree that to violate 18 U.S.C. § 2314, the defendant must induce the victim to travel in interstate commerce. *Id.* at 164. Thomas argues that Mukes's travel cannot satisfy the interstate travel requirement of § 2314 because Mukes was

not the victim of the fraud. The government asserts that if the person induced to travel is acting as an agent for the person defrauded, § 2314 is violated. We are persuaded by the government's argument.

Thomas concedes that the church and Pastor Holmes are victims of his scheme, as both lost money in his fraudulent investment program.[2] However, an organization such as the church may act only through its employees and agents, *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir.2001), and Mukes went to New York on behalf of the church. The Seventh and Ninth Circuits have held that when the interstate traveler is an agent of the "person" defrauded, whether the "person" is an entity or an individual, the victim has traveled for purposes of § 2314. *United States v. Steffen*, 251 F.3d 1273, 1276 (9th Cir.2001) (holding that the person who travels as an agent of person defrauded is a victim); *United States v. O'Connor*, 874 F.2d 483, 488 (7th Cir.1989) (holding that travel by an agent of defrauded corporation is imputed to the victim). We agree with our sister circuits that travel by an agent of the victim satisfies the interstate travel requirement of § 2314.[3]

### B.

Thomas argues that even if we hold that travel by the agent of the victim is covered by the statute, there was insufficient evidence that Mukes was an agent of the church. A defendant challenging a conviction based on insufficient evidence bears a heavy burden. *United States v. Tocco*, 135 F.3d 116, 123 (2d Cir.1998). We review all the evidence presented at trial "in the light most favorable to the government, crediting every inference the jury might have drawn in favor of the government," *United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir.1996), and we will affirm the conviction so long as "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original).

Neither the Seventh nor the Ninth Circuit discussed what constitutes an agent in the § 2314 context. Indeed, neither court treated agency as a separate analysis from representation of the victim. In *Steffen*, the traveler was described as the victim's "business associate," who was sent with the money to "investigate the investment." 251 F.3d at 1275. In *O'Connor*, the traveler "ran" and "operated" the company and traveled in a vain effort to collect payment on behalf of the defrauded corporation. 874 F.2d at 485, 488 & n. 5. In another context, we have defined an agency rela-

---

**2.** Both Thomas and the government assume that Mukes is not himself a victim of Thomas's fraudulent scheme without an agency relationship, presumably because Mukes did not personally lose any money. We are not so certain. We have held that a person may be defrauded within the meaning of § 2314 even if he was not the lawful owner of the stolen property. *United States v. Benson*, 548 F.2d 42, 46 (2d Cir.1977). Moreover, because the federal fraud statutes do not require that the scheme actually be successful, our use of the word "victim" is imprecise; what is actually criminalized is the travel of the intended victim. *See id.* (stating that "the scheme or artifice need only induce the travel not the

loot"). However, because the government does not argue this point, we do not pursue it further.

**3.** Despite Thomas's argument to the contrary, the rule of lenity has no place in our analysis because the statute is unambiguous. *See United States v. Speakman*, 330 F.3d 1080, 1083 (8th Cir.2003) (the rule applies only if a statute is ambiguous and is not "an overriding consideration of being lenient to wrongdoers") (quoting *Chapman v. United States*, 500 U.S. 453, 463, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991)).

tionship as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *United States v. Whiting Pools, Inc.*, 674 F.2d 144, 148 (2d Cir.1982) (quoting *Restatement (Second) of Agency* § 1 (1958)), *aff'd*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).

■ We are unpersuaded by Thomas's arguments that there was insufficient evidence that Mukes was an agent of the church. The record reveals that Mukes was the accountant, consultant, and financial advisor to the church. He was paid a monthly salary, was available to the church whenever it wished, and had access to the church's stationery and letterhead. In addition to the ongoing relationship between Mukes and the church, Mukes was "hired" to secure financing for the family life center. Mukes represented the church's financial situation to potential lenders in personal meetings and with a business loan package he had prepared. It was only through Mukes's inquiries on behalf of the church that the church came into contact with Thomas. Moreover, because of Mukes's relationship with the church and Pastor Holmes's lack of training in finance, Pastor Holmes relied heavily on Mukes to handle the church's financial matters. Though his suspicions were growing, Pastor Holmes followed Mukes's advice and gave Thomas more time to complete the program rather than immediately demanding the money back. The sole purpose of Mukes's interstate travel was to investigate the program that eventually defrauded the church and Pastor Holmes out of $100,000. Thomas himself acknowledges Mukes's close relationship with the church in general and in particular with this transaction. When Thomas argues in his brief that the conduct of the victim was not

sufficiently cautious, he cites more examples of Mukes's actions than Pastor Holmes's. Appellant's Brief at 31–32. Mukes was the primary person responsible for locating the financing and involving the church in Thomas's fraudulent scheme. Viewing the evidence in the light most favorable to the government, there is sufficient evidence of Mukes's agency relationship with the church to uphold the conviction.

■ Thomas argues that Mukes was an independent contractor and not an agent. This argument is unavailing because the two terms are not mutually exclusive; an independent contractor may also be an agent. *See Restatement (Second) of Agency* § 14N (1958) ("One who contracts to act on behalf of another and subject to the other's control except with respect to his physical conduct is an agent and also an independent contractor.") He argues next that Mukes was not an agent because the church agreed to pay him 4% of the loan amount once he secured a loan for the church. While Mukes was to receive a payment, much like a bonus, for securing the financing, he was also on the church's regular payroll and received a monthly salary. A fee such as this does not negate agency that otherwise exists.

Thomas next argues that Mukes cannot be an agent because there was no evidence that Mukes had the power to bind the church or negotiate terms, citing Mukes's statement to Thomas that the final decision on the investment program was not his to make. However, Thomas did not know that Mukes did not have the authority to bind the church when he induced Mukes to travel to New York. Only when Thomas wanted some documents signed did Mukes inform Thomas that he "did not have the final say-so." Thus, the evidence at trial would support an inference that when Thomas induced Mukes to come to

New York, he thought Mukes had the authority to bind the church. Mukes's travel was indeed essential to Thomas's scheme—without convincing Mukes of the viability of the investment program, Thomas would never have met Pastor Holmes or have had the opportunity to defraud the church. Moreover, a reasonable inference from the evidence is that Thomas's overall plan was to use Mukes, Pastor Holmes, and anyone else necessary to effectuate his scheme. *Cf. United States v. Kelly,* 569 F.2d 928, 935–36 (5th Cir.1978) (holding that § 2314 does not require specific intent to defraud a certain person; a general intent to defraud any person who might fall victim to the schemer's plan is sufficient).

Mukes's statements or beliefs on his capacity to bind the church are not determinative. *See id.* § 1, cmt. b ("The relation which the law calls agency does not depend upon the intent of the parties to create it, nor their belief that they have done so."); *id.* § 6, cmt. b (holding that the power to produce a change in a given legal relation "may exist irrespective of the consent or knowledge either of the one subject to it or of the one holding it"). Thomas fails to cite a theory of agency that depends on the agent's representations to a third party. Moreover, even if Pastor Holmes retained the authority to sign the final contract, Mukes could have been a special agent for the purpose of locating the financing. There was evidence at trial that Mukes did negotiate on behalf of the church. As Thomas himself admits, it was Mukes who developed the business plan to give to potential investors to help obtain a loan for the church. Finally, we are not concerned in this case with whether a contract signed by Mukes would bind the church. Rather, we must determine whether the relationship between Mukes and the church was such that Mukes's travel should be viewed as the victim's

travel for purposes of § 2314. *Cf. Attorney Gen. v. Irish N. Aid Comm.,* 668 F.2d 159, 161 (2d Cir.1982) (noting that in determining agency for purposes of Foreign Agents Registration Act, concern is not with agent's ability to impose liability on principal, but with whether relationship warrants registration to carry out purposes of statute). We are convinced that Mukes's relationship with the church was such that his travel could be viewed as the church's travel for purposes of § 2314. *See O'Connor,* 874 F.2d at 488.

### C.

Thomas makes a similar argument regarding the court's instructions to the jury on the travel element. The district court instructed the jury that it could convict if it found that Thomas, "in executing the scheme to defraud, either transported the person named in the indictment in interstate commerce or induced that person to travel in interstate commerce." The district court instructed that the traveler was Robert Mukes, a representative of the church.

■ The issue of whether Mukes's travel satisfies the statute was never raised at trial. Indeed, Thomas and his counsel acquiesced in the jury instruction. Thus, we will review only for plain error. Fed. R.Crim.P. 52(b); *United States v. Zvi,* 168 F.3d 49, 58 (2d Cir.1999). Thomas must therefore show (1) error, (2) that is plain and (3) that affected his substantial rights. *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). If Thomas carries this burden, we have discretion to notice the error, but will do so only if (4) the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings. *Id.*

■ We have already held that travel by the victim's agent is sufficient to satisfy

the interstate travel requirement of § 2314. While the district court's use of the word "representative" in its instruction was not the exact language of *O'Connor* and *Steffen*, it was not objected to and does not rise to the level of plain error. *See United States v. Weintraub*, 273 F.3d 139, 152 (2d Cir.2001) (holding that an error is plain only if it is clear under current law; when there is no binding precedent on point, an instruction typically will not be plain error). Moreover, we fail to see how any alleged error affected Thomas's substantial rights, *see United States v. Gore*, 154 F.3d 34, 47 (2d Cir. 1998) (to affect substantial rights, error must be prejudicial and must have affected the outcome of the proceeding), or seriously affected the fairness, integrity, or public reputation of the judicial proceedings.

### D.

■ Thomas argues next that there was insufficient evidence that Thomas "induced" Mukes's travel. We defined "inducement" in the § 2314 context in *Myerson:*

> The statute is intended to reach the fraudulent scheme whereby the criminal is the efficient cause of the interstate transportation and requires the defendant to be a motivating force in the victim's transportation.

18 F.3d at 164 (internal quotations and citations omitted).

There is compelling evidence that Thomas induced Mukes to come to New York. Mukes testified that he invited Thomas to Memphis to explain the investment program in greater detail. Thomas stated that "he was in New York, he couldn't come to Memphis, but if we wanted—I wanted to find out more about the program I would have to come to New York and meet with him in person." On cross-examination, Mukes clarified that Thomas said that "he was in New York, that he couldn't leave, but if we wanted to meet with him we would have to come to New York and find out more about the program." Mukes then flew from Memphis to New York City to meet with Thomas. Mukes had not previously been planning a trip to New York. He traveled for the sole purpose of meeting Thomas to research his investment program. We reject Thomas's argument that there was insufficient evidence of inducement; Thomas and his fraudulent scheme were a "motivating force" in Mukes's travel.

### II.

■ Thomas next argues that the district court erred in preventing the defense from questioning Pastor Holmes regarding the lack of caution he exercised during the fraud and in instructing the jury in this regard. During cross-examination of Pastor Holmes, Thomas's attorney began to question him about what actions he took when he discovered that the bank had not received the funds promised by Thomas. After several questions in this vein, the court called a side-bar sua sponte and said:

> The government's burden is to prove fraud. If it proves fraud it won't be a defense that the church was foolish and didn't make enough inquiries to realize that they were being lied to. If it is a misunderstanding about the nature of the investment, then no matter what the misunderstanding was the government will not have proved its case, but I'm not sure where we're going here with this line of cross-examination.

> DEFENSE ATTORNEY: Judge, what I'm asking him simply is if he did any homework in—with the monies and inquiries and I think—

> THE COURT: Up to now I've let you do this. I am concerned you are beginning

to insinuate to the jury that even if your client was engaged in a fraud this person could have discovered it if he had asked the right questions at the right time and I don't think that's a defense under the law unless I'm missing something.

DEFENSE ATTORNEY: I'm not—no, Judge, I'm not doing that.

THE COURT: Then I will ask you to move on.

The court then called a recess. Though neither party requested an instruction, the court stated to both parties that it was going to instruct the jury on the point. The district court then gave an extended instruction on fraud, stating in part that:

If ... when you listen to all the evidence, you do not find fraud proved, but what you find are misunderstandings between people not the product of deliberately false statements or deliberate material omissions, misunderstandings, then in the end it won't matter who you think could have avoided the misunderstanding, there will be no crime.

On the other hand, if you find fraud proved, it will be no defense that a person, well, if he had asked one more question or had probed further might have discovered that the statement was false. What's going to be crucial is whether you find the government to have proved beyond a reasonable doubt that the defendant as charged was involved in a scheme where he made material false statements to induce the victim to give up monies or deliberately failed to disclose material statements in order to induce the person to give up money.

Neither party objected to the instruction.

Thomas asserts that the district court erred in restricting the cross-examination of Pastor Holmes. As it is the "trial judge [who] is in the best position to weigh competing interests in deciding whether or not to admit certain evidence," *United States v. Holmes,* 44 F.3d 1150, 1158 (2d Cir.1995) (quotation marks omitted), "[t]he decision of the trial court to restrict cross-examination will not be reversed on appeal unless its broad discretion has been abused," *United States v. Maldonado–Rivera,* 922 F.2d 934, 956 (2d Cir.1990). The district court did not abuse its discretion in restricting the cross-examination of Pastor Holmes because the court gave Thomas's counsel the chance to explain the legal relevance of the line of questioning and counsel demurred. Thomas now claims that the district court erred in preventing him from doing something that he explicitly stated to the district court he was not seeking to do. There was no abuse of discretion.

Thomas also asserts error in the court's mid-trial instruction. Thomas claims that Pastor Holmes's vigilance (or lack thereof) was relevant because courts have described a scheme to defraud as one "reasonably calculated to deceive persons of ordinary prudence and comprehension."[4] *Silverman v. United States,* 213 F.2d 405, 407 (5th Cir.1954); *accord United States v. Regent Office Supply Co.,* 421 F.2d 1174, 1181 (2d Cir.1970); *United States v. Press,* 336 F.2d 1003, 1010 (2d Cir.1964); *United States v. White,* 673 F.2d 299, 302 (10th Cir.1982).[5] He asserts that there can be

---

4. In its closing charge to the jury, the district court instructed that "any false statement or any deceptive or misleading representation, which is calculated to deceive or mislead a person of ordinary caution, is considered fraudulent under the law."

5. All of the cases Thomas cites are mail fraud cases, which is appropriate because the travel fraud statute, the mail fraud statute and the wire fraud statute all criminalize a "scheme to defraud." 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C.

no fraud if the victim did not act as a person of ordinary prudence and comprehension would. As Thomas did not object at trial and makes this argument for the first time on appeal, we review the instructions for plain error.[6] *See* Fed.R.Crim.P. 52(b); *United States v. Olano,* 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Thomas relies on *United States v. Brown,* an Eleventh Circuit case which states a minority rule that there is no fraud when "the representation is about something which the customer should, and could, easily confirm ... from readily available external sources." 79 F.3d 1550, 1559 (11th Cir.1996); *see also United States v. Brennan,* 183 F.3d 139, 151 (2d Cir.1999) (citing *Brown* without discussion in dicta). However, the Eleventh Circuit recently rejected the exact argument Thomas is advancing here—that the mail fraud statute does not reach material, false representations if a reasonable person would not have acted upon them. *United States v. Gray,* 367 F.3d 1263, 1269–71 (11th Cir.2004). Moreover, as in *Gray, Brown* is distinguishable because Thomas's representations "did not lend themselves to easy verification." *Id.* at 1270–71.

■ The "unreasonable victim" argument misapprehends the function of the ordinary prudence standard. To establish a violation of the federal fraud statutes, the government must prove a scheme to defraud. *See, e.g., United States v. Myerson,* 18 F.3d 153, 164 (2d Cir.1994) (travel fraud). Critical to this showing is evidence that the defendant "possessed a fraudulent intent."[7] *United States v. Wallach,* 935 F.2d 445, 461 (2d Cir.1991). The role of the ordinary prudence and comprehension standard is to assure that the defendant's conduct was calculated to deceive, not to grant permission to take advantage of the stupid or careless. *See United States v. Drake,* 932 F.2d 861, 864 (10th Cir.1991).

The ordinary prudence language arose in the seminal case of *Silverman v. United States,* 213 F.2d 405 (5th Cir.1954). In *Silverman,* the defendant's scheme to defraud, though misleading, did not involve any patently false representations. Rejecting defendant's argument that he could not be convicted under the mail fraud statute absent a misrepresentation, the Fifth Circuit held that:

> [I]f a scheme is devised with the intent to defraud, and the mails are used in executing the scheme, the fact that there is no misrepresentation of a single existing fact makes no difference. It is only necessary to prove that it is a scheme

§ 2314 (travel fraud). Because all these statutes "use the same relevant language, they are analyzed in the same way," *United States v. Pierce,* 224 F.3d 158, 165 n. 5 (2d Cir.2000), and we have previously acknowledged their close relationships, *see id.* (mail and wire fraud); *Benson,* 548 F.2d at 46 (travel and mail fraud).

6. We reject Thomas's argument that because the district court gave the instruction sua sponte, we should not review for plain error. While it is true that neither party requested the instruction, the district court warned both parties that it was going to give an instruction, the instruction was given in Thomas's presence, and he had plenty of opportunity to object to it. He choose not to do so. More-

over, Thomas's failure to object was consistent with his representation to the district court that he was not seeking to assert a defense based on the victim's negligence. We therefore review for plain error. *See United States v. Coleman,* 284 F.3d 892, 894 (8th Cir.) (reviewing sua sponte instruction for plain error), *cert. denied,* 537 U.S. 935, 123 S.Ct. 35, 154 L.Ed.2d 235 (2002).

7. To prove a scheme to defraud, the government must prove three elements: (1) the existence of the scheme, (2) fraudulent intent (including some contemplated actual harm or injury, *United States v. Starr,* 816 F.2d 94, 98 (2d Cir.1987)), and (3) materiality. *See United States v. Autuori,* 212 F.3d 105, 115 (2d Cir.2000).

reasonably calculated to deceive persons of ordinary prudence and comprehension
. . . .

*Id.* at 407. Thus, in a case with no evidence of any false representation, the Fifth Circuit used the ordinary prudence standard as a way to determine whether the defendant acted with fraudulent intent.

■ The ordinary prudence standard therefore focuses on the violator, not the victim. *See Drake,* 932 F.2d at 864; *accord Regent Office Supply,* 421 F.2d at 1181 (focusing the ordinary prudence standard on the defendant's intent by referring to the defendant's motivations in making the representations); *Press,* 336 F.2d at 1010 (focusing on defendant's conduct); *cf. United States v. Trapilo,* 130 F.3d 547, 552 (2d Cir.1997) (stating that the "identity and location of the victim . . . are irrelevant" in proving a wire fraud scheme). Thus, the standard is a tool the jury may utilize to gauge the defendant's intent and is helpful in situations in which the defendant's intent to deceive may be unclear. For example, if the defendant asserts that he was merely joking, that the statements were mere puffery, or that the statements were merely sharp business dealing, evidence that the statements would have deceived a person of ordinary prudence and comprehension is evidence that defendant actually intended to deceive. *United States v. Coffman,* 94 F.3d 330, 333–34 (7th Cir.1996) (Posner, J.) (rejecting "unreasonable victim argument"; the ordinary prudence standard helps the jury determine if defendant had fraudulent intent and helps distinguish between sharp dealing and fraud). Thus, the ordinary prudence standard is not a shield which a defendant may use to avoid a conviction for a deliberately fraudulent scheme.

■ We therefore reject Thomas's argument that the foolishness of Pastor Holmes's belief in Thomas's fraudulent scheme somehow vitiates Thomas's fraudulent intent. We refuse to accept the notion that " 'the legality of a defendant's conduct would depend on his fortuitous choice of a gullible victim.' " *United States v. Benson,* 548 F.2d 42, 46 (2d Cir. 1977) (quoting *United States v. Pollack,* 534 F.2d 964, 971 (D.C.Cir.1976)). Most circuits that apply the ordinary prudence and comprehension standard have already rejected some form of the "unreasonable victim" argument. *See Gray,* 367 F.3d at 1269–71; *Coffman,* 94 F.3d at 333; *United States v. Coyle,* 63 F.3d 1239, 1243–44 (3d Cir.1995) (holding that although fraudulent scheme must be reasonably calculated to deceive persons of ordinary prudence and comprehension, the "negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct"); *Drake,* 932 F.2d at 864; *United States v. Kreimer,* 609 F.2d 126, 132 (5th Cir.1980) (holding that the "victim's negligence is not a defense to criminal conduct"); *Linden v. United States,* 254 F.2d 560, 567–68 (4th Cir.1958) (concluding that a scheme to defraud was reasonably calculated to deceive persons of ordinary prudence and comprehension even when victims were careless because form was designed not to be read carefully); *cf. Neder v. United States,* 527 U.S. 1, 24–25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (noting that the requirement of justifiable reliance "plainly [has] no place in the federal fraud statutes"). We now join them. As we have already held, the victim's *"gullibility* or his own criminal background is not relevant to the inquiry as to whether the defendants were properly convicted under section 2314." *Benson,* 548 F.2d at 44 (emphasis added); *cf. United States v. Allen,* 201 F.3d 163, 167 (2d Cir.2000) (enhancing wire fraud sentence for abuse of position of trust because even if victims were negligent, the

"victim's negligence in permitting a crime to take place does not excuse the defendant from culpability for her substantive offense"). If we held otherwise, we would be inviting "con men to prey on people of below-average judgment or intelligence, who are anyway the biggest targets of such criminals and hence the people most needful of the law's protection." *Coffman*, 94 F.3d at 334. We decline to so hold.

### III.

Finally, Thomas argues that prosecutorial misconduct deprived him of a fair trial, claiming that his due process rights were violated when the prosecutor asserted in her closing argument that Thomas lied when he testified on his own behalf.

■■■■■ "Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." *United States v. Young*, 470 U.S. 1, 11–12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). To require reversal of a conviction, "a prosecutor's comments upon summation must 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'" *United States v. Coriaty*, 300 F.3d 244, 255 (2d Cir.2002) (alteration in original) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). Therefore, we will reverse only upon a showing "'(1) that the prosecutor's statements were improper and (2) that the remarks, taken in the context of the entire trial, resulted in substantial prejudice.'" *United States v. Perez*, 144 F.3d 204, 210 (2d Cir.1998) (quoting *United States v. Bautista*, 23 F.3d 726, 732 (2d Cir.1994)).

During the prosecution's closing argument, the Assistant United States Attorney stated:

Now, this defendant in this case had absolutely no burden. It has been the government's burden throughout the trial to prove his guilt beyond a reasonable doubt. We embrace that burden, but when Wade Thomas took the stand and lied over and over again, he put his credibility on the line. He chose to do that.

Now that you've heard him you should be outraged, because he got up—

DEFENSE COUNSEL: Objection, Judge.

THE COURT: Overruled.

PROSECUTOR:—and he lied and his story did not add up.

THE COURT: Let me see you at side-bar.

At side-bar, defense counsel clarified his objection, protesting the prosecutor's characterization of the defendant as a liar. The court cautioned the prosecutor to refrain from using the term "lied." The trial judge immediately instructed the jury:

Ladies and gentlemen, I am going to sustain the objection to [the prosecutor's] characterization of the defendant as having lied. This is a finding that is left to the jury. By that I mean finding with respect to credibility. The parties can argue to you as to why you should find someone credible or not credible, but I've asked them not to themselves state a conclusion on it, but rather to point you to things that will assist you in making you own independent determination.

■■■■ To determine whether the prosecutor's argument was improper, we must examine the statements in the context of the trial and the summation in its entirety. *See United States v. Resto*, 824 F.2d 210, 212 (2d Cir.1987). Thomas argues that any use of the term "liar" is misconduct; the government argues that in this case it was a fair comment on Thomas's credibility.

Thomas is correct that we have been critical of the prosecution's use of any form of the word "lie," especially when characterizing the defendant's testimony, *see, e.g., United States v. White*, 486 F.2d 204, 206 (2d Cir.1973) (stating that prosecutor's assertion that defendant was lying and defense was fabricated was inconsistent with duty of prosecutor "to seek justice"), and we have even reversed convictions in extreme cases, *see United States v. Drummond*, 481 F.2d 62, 64 (2d Cir.1973) (reversing after repeated prosecutorial misconduct in trial, including comment that defendant's testimony was "so riddled with lies it insults the intelligence of 14 intelligent people sitting on the jury"). However, we have also held that use of the word was not misconduct. *See Resto*, 824 F.2d at 212 (holding prosecutor's statement that defendant's testimony was "out-and-out lies" not improper because not excessive or inflammatory); *United States v. Peterson*, 808 F.2d 969, 977 (2d Cir.1987) ("Use of the words 'liar' and 'lie' to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory.").

■■■■ It is unnecessary for us to determine whether the prosecutor's statements in this case constituted misconduct because even if the comments were improper, they did not cause Thomas substantial prejudice. When considering whether an improper comment caused the defendant prejudice, we consider three factors: (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the certainty of conviction absent the improper statements. *United States v. Evangelista*, 122 F.3d 112, 120 (2d Cir.1997).

The "severity of the misconduct is mitigated if the misconduct is an aberration in an otherwise fair proceeding." *United*

*States v. Elias*, 285 F.3d 183, 191 (2d Cir.), *cert. denied*, 537 U.S. 988, 123 S.Ct. 430, 154 L.Ed.2d 356 (2002). The alleged misconduct, if any, was not severe in this case. Thomas objects to the use of one word in the prosecution's summation. The opening statement and the prosecutor's conduct throughout the rest of the trial is unchallenged. The prosecution only used the word twice and immediately stopped when warned by the district court.

As to the measures adopted to cure the misconduct, Judge Raggi provided an immediate curative instruction. The instruction was detailed and clarified that any determination of a witness's credibility was within the province of the jury. The judge also instructed at the end of the trial that statements made by the lawyers during the trial were not evidence. *See id.* at 192 (when misconduct is not severe, pattern instruction on statements of counsel may help mitigate impact).

Finally, it is highly likely Thomas would have been convicted even in the absence of the prosecutor's remarks. To prevail on his claim, Thomas must demonstrate that, absent the misconduct, he would not have been convicted. *See id.* He cannot meet this burden. The proof of guilt was strong in this case, making any potential prejudice from the comments less likely. *See United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir.1981) ("[I]f proof of guilt is strong, then the prejudicial effect of the comments tends to be deemed insubstantial."). The evidence against Thomas included the testimony of Pastor Holmes and Robert Mukes, the testimony of several witnesses concerning the fraudulent nature of the documents Thomas provided, testimony that Thomas had personally spent the church's money, and testimony that Thomas had misrepresented his credentials to the church. Thomas was the sole witness for the defense. Considering the

strength of the evidence against Thomas, it is highly unlikely that the use of the word "lied" twice by the prosecutor would have made any difference in the jury's verdict. *See United States v. Sprayregen,* 577 F.2d 173, 174–75 (2d Cir.1978) (affirming conviction despite disapproval of prosecutor's remarks that defendant lied on the stand); *United States v. Bivona,* 487 F.2d 443, 446 (2d Cir.1973) (affirming conviction despite disapproval of prosecutor's characterization of defendant's testimony as "falsehoods" and "lies"); *White,* 486 F.2d at 206–07 (affirming conviction despite prosecutor's statements that defendant was lying and that his defense was fabricated).

## CONCLUSION

Accordingly, Thomas's conviction is AFFIRMED.